[Civ. No. 3408. Third Appellate District.—February 13, 1929.]

THE CITY OF STOCKTON (a Municipal Corporation), Appellant, v. WILLIAM W. ELLINGWOOD et al., Respondents.

J. LeRoy Johnson, Thos. Louttit and William G. Snyder for Appellant.

F. J. Solinsky, Nutter, Hancock & Rutherford, Joe Huberty, Ralph McGee and A. P. Hayne for Respondents.

PLUMMER, J.—The transcript in the above-entitled cause includes the record on appeal of nineteen actions consolidated for the purposes of trial. Five of these actions have been dismissed, leaving for our present consideration the appeals in fourteen of said actions. For the purposes of convenience the defendants and respondents will hereafter be referred to as defendants and respondents, without naming the particular defendant or respondent, only in cases where necessity requires.

The actions are all eminent domain proceedings, instituted by the City of Stockton to acquire certain lands and premises to be used as a reservoir site.

In the year 1924, the voters of the City of Stockton, pursuant to an election had in accordance with the resolutions adopted by the City of Stockton, authorized a bond issue in the sum of $1,500,000, for the purpose of constructing a flood control dam on the Calaveras River, in the county of Calaveras. The defendants in the actions referred to are the owners of several tracts of land lying easterly of the site of the dam proposed to be erected for restraining and controlling the flood waters of said stream, which would, in part, be submerged in the event of the construction of the.

flood control dam. The action involves the ascertainment of the value of the land proposed to be submerged, and the value of adjacent lands thereto which would be injured or lessened in value by reason of the severance therefrom of the lands submerged.

The cause was tried before the court sitting without a jury, findings made and the judgment entered fixing the value of the submerged lands, the lessened value caused to contiguous lands by severance, and the value of the improvements which would be injured or destroyed by the holding back of waters of the Calaveras River. The record shows that the City of Stockton proposes to erect a restraining dam of the height of about 144 feet on the Calaveras River, at the site mentioned in the proceedings; that by means of spillways and flood gates it proposes to control the flood waters of said stream during the rainy season, in such manner as to avoid the danger of periodical flooding to which the city was subjected prior to the year 1911, when a diverting canal was built to the east and north of the City of Stockton, since which time the flood waters of said stream have been thrown back upon the agricultural lands adjoining the city. By means of the proposed restraining dam the flood waters gathered by the Calaveras River would be allowed to escape from the reservoir created by the building of the dam in question, in such quantities only as would not endanger the flooding of the City of Stockton or any of the adjoining territory. Between the City of Stockton and the site of the proposed dam there are several thousand acres of land called the "plain land," before the foothills are reached, which gradually merge into the Sierra Nevada mountains. The ascent from the plain land just referred to, to the site of the proposed dam, is more or less gradual so that the elevation of the foot of the proposed dam is estimated to be at about 530 feet above the level lands lying to the west of the foothills just referred to. The dam proposed to be erected by the appellant, when completed, will have a maximum elevation of between 670 and 680 feet above sea-level, and the 674-foot contour line mentioned in the testimony is the maximum height to which the impounded waters will reach after the construction of the proposed dam. The testimony introduced on the part of the defendants, in most part had reference to, and was directed to a possible

dam 200 feet in height that might, owing to the adaptability therefor of the site on which the proposed dam was to be erected, place the maximum flood countour line at an elevation of 730 feet. Expert witnesses were placed on the stand by the defendants and proceeded to testify as to the adaptability and possibility of erecting a 200-foot dam. The testimony tends to show that the watershed lying easterly of the site of the proposed dam covers some 394 square miles; that such a dam would have a reservoir capacity of $350,000 acre-feet and would afford water for irrigation purposes of from 34,000 to 50,000 acres of land lying in the foothills and plain lands of Calaveras and San Joaquin Counties to the westward, to which water for irrigation and other purposes might be conducted by gravity; that such a reservoir would afford water for domestic purposes for the citizen-towns of San Joaquin and adjoining counties; that the waters from the reservoir might also be used for power purposes at a point near Jenny Lind, in Calaveras County, where a drop of approximately 200 feet might be had.

The record on appeal is exceedingly voluminous, comprising fourteen volumes of testimony of approximately 500 pages each. The examination of witnesses, both direct and cross, was almost interminable, and the testimony introduced can only be set out in this opinion to a limited degree and by way of illustration.

Three grounds of error are assigned by the appellant for reversal herein, to wit: 1st. That the trial court misapplied the rule concerning severance damages, in action number 3176, as that number is given the cause in the trial court, concerning lands operated by Louis Vogelgesang and Gustave D. Vogelgesang, doing business as partners. 2d. That the trial court erroneously awarded damages in action number 3161, as that number appears in the trial court, for alleged destruction of an easement over a certain road or highway claimed by Ellingwood and Vogelgesang. 3d. That the findings of the trial court as to the compensation to be awarded the various defendants for the land taken, and also as severance damages, are not supported by legal evidence, and that the judgment based upon such findings is erroneous.

We will consider the assignments in the inverse order in which they are made, by reason of the fact that the major contention upon this appeal involves the testimony relative

to the reservoir adaptability of the lands sought to be taken, the method of ascertaining the sums that should be paid therefor by the City of Stockton, and to what extent the damages may be claimed, whether only to the 674-foot contour line or to the 730-foot contour line, as contended for by the defendants. As there are somewhere between forty and sixty different parcels or tracts of land involved, the question is also presented for consideration whether testimony as to reservoir possibilities or adaptability of the different tracts should be admitted as an element of ascertaining value, in view of the fact that none of the parcels of land, taken singly, would have adaptability for reservoir purposes.

The testimony introduced on the part of the respondents was practically all directed to the availability and adaptability of the lands for reservoir purposes, and that the special value for such purposes gave to the land sought to be condemned a market value largely in excess of that which should be given, when other purposes for which the land was adapted were considered. On the part of the appellant practically all of the witnesses based their estimate of the market value of the lands sought to be condemned upon their agricultural possibilities, to wit, their value for farming, grazing and stock-raising. ▮▮▮ While a great deal of language has been used in different decisions having to do with the fixing of values, it is evident that the law contemplates one purpose in eminent domain proceedings, and that is that the land owner shall be compensated for the full market value of his property taken, irrespective of what the elements may be which enter into the making up of that value. Market value, also, is a relative term. While the distinction is not clearly made in many of the cases, it requires only the application of a little common understanding for the court to appreciate that one seeking land for grazing purposes or to use for ranging sheep would not consider the purchase of lands adaptable, for example, to the cultivation of asparagus. On the other hand, a purchaser looking for asparagus land would find no marketable value whatever in lands suitable only for grazing. No one would consider for a moment the correctness of estimating lands suitable for asparagus culture, upon the basis of use for stock-raising, or a score of other like uses to which such lands might possibly be devoted. Likewise, in determining the market value of

asparagus lands, common understanding would lead one to inquire as to the price which a willing buyer would pay who wanted land suitable for asparagus culture. The market value of land suitable for asparagus culture would also be determined, to some extent, upon the number of people in the market for that character of soil. In the case at bar the testimony of the respondents' witnesses fixed the major portion of the lands to be submerged at $100 per acre. On the other hand, the values fixed by the witnesses for the appellant reached an average of about $25 per acre. An examination of the testimony which we have read, page after page, as given by the different witnesses, exhibits clearly that the different sets of witnesses had in mind different elements in fixing values. Thus, the witnesses for the respondents accentuated the values given to the lands by reason of their natural location, for use as a reservoir for storing waters gathered from the watershed to which we have referred. Conversely, many of the witnesses for the appellant testified as to values based upon the availability of the lands for grazing and general agricultural purposes. A few only of the witnesses for the appellant possessed the engineering ability or capacity, gained either by study, observation, or experience, to take into consideration and testify to the availability of the lands for reservoir purposes, or the value of such lands adaptable for such purposes. Again, when it is said that the market value of lands is the price which a willing buyer will pay and a willing seller accept, if we leave out of consideration the purpose for which the land is peculiarly available, and the length of time ordinarily required to find a purchaser who wants lands for which the lands to be condemned are peculiarly adapted, or the length of time which it would require the land owner to find such a purchaser, we overlook an essential element of value. Thus, there may be a large number of people who probably are ready to buy grazing lands on which they may herd sheep or cattle, but the number of persons having the capital, or the number of corporations or municipalities seeking lands for reservoir purposes is, from the nature of the case, more or less limited. Thus, it is readily apparent from this statement that if the value of lands which are peculiarly adapted to a purpose that gives a much higher value, it would be taking the lands without returning just

compensation if an award is made based upon testimony of witnesses considering the minor elements only. In this particular we speak of the major element as that which gives the highest value; minor elements, those which enter into establishing the lesser values. ■ If the lands sought to be condemned are peculiarly valuable for reservoir purposes, we think the following is a correct statement of the law as applied to the pending actions: What the land is worth in the market for reservoir purposes, not what it is worth to the condemnor for reservoir purposes, is the major factor to be considered by the court in making its award of damages. Again, the fact that the condemnor does not propose to make the highest use of the lands is not a determining factor. If the highest use of the land to which it is adapted for reservoir purposes would be subserved by a 200-foot dam, we think such testimony admissible. As said by this court in the case of *City of Stockton* v. *Vote*, 76 Cal. App. 369 [244 Pac. 609] : ''The fact that the party seeking to condemn is not proposing to make the highest use of the condemned property is not a matter to be taken into consideration in determining values, any more than the value of the use of the property to the condemnor is likewise not to be considered. Both of such elements are inadmissible.''

Appellant makes the preliminary objection that the witnesses for the respondents were not qualified to testify as experts or were not qualified to testify as to the market value of the lands. Their competency as hydraulic engineers, their experience in building reservoirs, their acquaintance with other reservoir sites, their experience in obtaining rights of way, easements and lands to be used for reservoir purposes, do not appear to be seriously questioned. The argument challenges the competency of the various witnesses to testify as to the market value of the lands involved. The rule of law applicable to such witnesses is succinctly stated in the case of *Reed* v. *Drais*, 67 Cal. 491 [8 Pac. 20] : ''Where a witness is produced to testify in the character of an expert, as to the value of property, it should appear that he has some special skill or experience or peculiar knowledge of the value of the class of property about which it is proposed to question him, such skill or knowledge having been acquired by him in the line of his profession or business. . . . There is no doubt that a witness acquainted with the value of property

may give an opinion as to such value, but he must first be shown to possess such knowledge, and then, although such knowledge is not the result of any peculiar skill in a particular pursuit or branch of business or department of science, he may yet be heard.'' ▮ Applied to this case, the two rules would govern as follows: If a witness, by reason of his skill, learning, or technical training, understands the adaptability of the lands in question for a particular purpose, and the demand for land for such purpose, he may state the market value of the land, although he may be entirely unacquainted with the other elements which would be considered by different buyers competing for the same property. On the other hand, if the witness has knowledge of the market value of the lands, even though he possesses no technical skill, training, or ability, he may state the market value. The different elements considered by the witnesses in giving their opinions as to market value may be inquired into upon cross-examination, and if, upon such cross-examination, it appears to the court that the witness' testimony is based upon improper consideration, or upon what is usually termed as speculative only, it should be stricken from the record or withdrawn from the consideration of the court or the jury. While the qualifications of the witnesses may be inquired into with considerable minuteness upon direct examination, it does not appear that testimony as to the value of lands for any special purpose may be given by the witness in dollars and cents. The witness may be questioned as to every adaptability that would give value, but his opinion must not be expressed in the general terms of so much money as the market value. For instance, it is common knowledge that many of the mining properties in the foothills of the Sierras afford considerable forage, and in outward appearance resemble ordinary range lands. A witness, by reason of his technical skill, learning capacity, and training where the question is involved, might be allowed to express his opinion as to the market value of the properties, and though his opinion as to market value took into consideration the value of the premises for mining purposes, it could not be logically argued that such testimony should be stricken from the record because other witnesses saw only a surface value as a range for sheep or cattle.

■ We have read the direct examination of every one of the witnesses whose competency to testify is challenged, and while perhaps in one or two cases the preliminary examination is not as full and complete as it might have been, we think the objection urged by appellant on this ground is untenable. The volume of the testimony precludes setting forth any of that given by the witnesses upon direct examination. To support its contention that the motion to strike from the record the testimony given by the respondents' witnesses should have been granted, portions of the cross-examination of each witness is set forth in appellant's brief. While we have read the full cross-examination, we will confine ourselves to the excerpts found in the brief, of which we can set forth only a limited portion by way of illustration. The first illustration is from the testimony of the witness O'Shaughnessy, on cross-examination: "Q. What do you mean when you state that these lands have a market value of a certain figure, what do you mean by the term 'market value?' A. The value they are worth to any corporation, private or public, who will proceed to develop a water system in this region. Q. Am I to infer from that, that that is the price you think they would be justified in paying cash for this land? A. I believe the development of projects will justify this price. Q. When you say 'justify,' what do you mean? A. I mean to say that if those lands, acquired at the figure I have designated and a proper designed dam is built on your proposed damsite and the waters of this stream are conserved, that the income obtained from the waters and the power combined will be a fair return on the investment. . . . Q. That is, you are taking the prices that were paid for other reservoirs? A. In similar localities. Q. And applying it to this one? A. I am. Q. Now, in determining the market value of these lands in 1924, didn't you consider the total cost of the entire reservoir basin? A. I made comparisons between this water project as a whole on this river and the development of the Stanislaus river south of here, development on the Tuolumne river and the development on the Merced river and made broad comparisons of the drainage areas tributary to all those rivers; the annual runoff flow of water obtained for a period of years on each watershed and the relative and economic value of dam construction on all those rivers, and I might say that

I might be credited with a very broad experience in the United States and Hawaii on reservoirs and damsites in general. Q. Have you made any inquiry to determine whether or not the power that might be generated here might be sold? A. I have not. Q. Then your opinion is based upon what has happened elsewhere, is it? A. North and south. Q. How many horsepower, in your opinion, could be developed at this plant? A. Possibly twenty-five or thirty thousand horsepower. Q. I presume that you contemplate that that power will be sold in the San Joaquin Valley? A. It will have to be sold in the valley. Q. In considering the possible sale of that energy did you consider the City of Stockton as a possible purchaser of it? A. No. Q. In contemplating the development of energy at this place, did you contemplate that as part of an irrigation district or part of an irrigation use? A. Just as in the Merced case, the energy developed during the irrigation season. Q. Do you think that the Merced District and this situation are comparable? A. They are exactly similar. Q. And you are comparing the situation here, I presume, as a complete scheme, are you, in comparing it with the Merced District? A. I am. Q. Well, in utilizing this energy as a by-product of irrigation, do you believe that you could sell all of it? A. I believe every bit of energy could be sold." We may here state that the court, in estimating damages, fixed the value at an average of $80 per acre, although the witnesses for respondent gave their opinion of value as $100 per acre, and the witnesses for the appellant, at an average of about $25 per acre.

Upon cross-examination the witness Galloway testified as follows: "Q. The lands we seek are in sections 5 and 8; you gave the value of the lands we seek; what was the basis of your computation in this particular case? A. For the lands that are completely submerged and below the 730 foot contour, $100.00 per acre; for the lands in the tract sought to be condemned above the 730 contour, $15.00 an acre; and the value destroyed on the whole tract outside of the portion condemned, $85.00 an acre. Q. Then your value in that particular case did include damage in your opinion to the lands that we do not seek in this case? A. Yes, that is true. Q. And your unit price for the lands below the 730 foot contour which I presume you designate as reservoir lands, is

$100.00 per acre? A. That is correct. Q. How did you arrive at a figure of $85.00 per acre damage to the lands which we do not seek and which are below the 730 foot contour? A. I arrived at it in this way: It is my general opinion that the submerged lands below the 730 foot contour are worth $100.00 an acre; in taking the whole site for a reservoir, certain lands that you do not take have a reservoir value destroyed; the total value is $100.00 per acre; if you do not take the land but destroy the reservoir value, the only value that is left to the owner is the value of about $15.00 an acre; therefore, the destroyed value is $85.00 an acre. Q. Did you give any of them a higher unit price than $100.00 an acre? A. I did.'' This witness then testified as to the value of certain gravel deposits which appears to have been disregarded by the court in its findings, and, therefore, will not be given space in this opinion. The witness was then further interrogated: ''How did you arrive at the $100.00 per acre? A. Through a general consideration of a large number of factors; the price of lands in other regions; the price of lands in other reservoir sites of which I endeavored to keep track and what is paid for them; by general experience in dealing with matters of that sort in relation to the construction of reservoirs and the relation between the size of the reservoir, the cost of constructing the dam, the flow of the stream and the developments of various types such as irrigation and power that may be had from such a reservoir. I took into consideration all those elements and endeavored to arrive at a value of the land. . . . Q. As I understand your explanation, the land which lies above the 730 foot contour is valued at $15.00 per acre. A. That is correct. Q. And the land immediately below that contour line is valued at $100.00 per acre? A. That is correct. Q. The difference is due to its reservoir adaptability? A. That is true. Q. Mr. Galloway in considering the reservoir adaptability of any individual parcel of this proposed basin, I presume you assumed its junction with the other necessary parcels? A. One must have it so. Q. And isn't it a fact, Mr. Galloway, that your information concerning the reservoir adaptability of these lands is based upon your belief that from the engineering standpoint, a project at this place is feasible? A. Certainly, I think it entirely feasible.''

The witness Ellis, on cross-examination, testified: "Q. When you stated you had two unit prices, what were those unit prices on which you based your values? A. I used for reservoir lands or lands to be submerged one hundred dollars an acre and for lands which were above the 730 foot contour line, twenty dollars an acre. Q. How did you arrive at the figure as to the market value of this land in 1924? A. That was my estimate as to what it was worth as a site for a dam. Q. As to what it was worth to whom? A. To anyone building a dam. Q. How did you arrive at that particular unit price? A. That is simply my judgment; I have no mathematical formula; that is a price that I would recommend a client to pay for a damsite of that character." This witness testified that the particular land on which the dam was to be located was of the value of $250 an acre. "Q. How long would it take to obtain a purchaser at your figure? A. I could not say; I conceive that land as being acquired and sold as a part of a reservoir. My reasoning was this: Anyone developing that reservoir would naturally want that damsite; that a reservoir project of that character and with its very salient features of economy for reservoir development would have a strong appeal in the modern trend up and down the mountains which flank the valley, with a reasonable time I think the damsite and reservoir lands and all those would be sold at a figure I put on them. Q. Now, your value of $100.00 an acre, how did you arrive at that figure? A. My value of $100.00 an acre was influenced by several factors. I first felt that this land had a very high reservoir value, higher even than comparable lands in many other instances, due to the fact that with the 200 foot dam there can be impounded 350,000 acre feet which is something rather rare; that means that your cost per acre foot of storage would be very much less, far away less than ordinarily encountered, without going into any figures as to the cost. The mere fact that a 200 foot dam would have impounded 350,000 acre feet indicated a high reservoir value. In other words, a person could afford to purchase that land and erect a dam and develop very cheap storage for three purposes, for irrigation, power and domestic supply. Again, I had some knowledge of reservoir lands that had been acquired. I had in mind prices that were paid for lands by the city of San

Francisco for lands lying adjacent—particularly adjacent to the Hetch-Hetchy reservoir, for which the price, as I recall it, was something in the neighborhood of $115.00 an acre.'' This witness then gave a rather extended statement of elements entering into the value of reservoir properties, and his experience therewith, and his opinion that if the properties were not clouded by this proceeding, purchasers therefor could be had at the values estimated by the witness. The witness Polk testified along similar lines upon cross-examination, and also to the further fact that he made no inquiry of sales of' land for agricultural purposes, and then answered questions as follows: ''Q. The buyer you have in mind must necessarily have been one who at the time would have been buying it for the purpose of using it in the development of this reservoir scheme that you have testified to? A. Yes, sir. Q. When you speak of your experience you refer to results, primarily, in other districts where water projects have actually been developed? A. Partly, yes. Q. Contemplating those matters, and looking forward to the time when the project would be developed, you arrived at the figure you gave for the market value of the land? A. Yes. Q. It is always as a reservoir and water storage proposition that you are dealing with, the value that you are giving here? A. Yes, sir. Q. And in arriving at your value, of course you necessarily assume that the lands would be united? A. Certainly.'' The witness Pache, after testifying as to his experience with the South San Joaquin and Oakdale Irrigation Districts, answered questions as follows: ''Q. And you believe there is a comparable project here in this vicinity? A. All things considered, I do. Q. And that is one of the bases upon which you form your opinion as to the value of the lands in the Calaveras River Basin? A. Yes, sir. Q. In January and February, 1925, you were procuring options on property in this basin for the irrigation districts, were you not? A. Yes, sir. Q. And the land was being purchased, as I understand, exclusively for reservoir purposes? A. Exclusively for the districts. Q. Now, in these lands that you designate as reservoir lands and value them at $100.00 per acre, will you explain to the court by what process you arrive at that valuation of $100.00 per acre? A. By observation, my own experience in buying lands of similar character for reser-

voir purposes. Q. And in fixing that value, do you take into consideration the possible yield which may be produced by the use of that land for reservoir purposes? A. No, sir. Q. And the only reason you fixed the price at $100.00 per acre is because of the comparison of this situation with your experience in buying reservoir lands for the two irrigation districts on the Stanislaus River? A. And my general observation of the beneficent results, creation of reservoirs, the water thereof to be used for various purposes. Q. Now, on that land which is available for reservoir purposes what, in your opinion, is added to the value of this reservoir available lands by reason of the fact that there are improvements located thereon? A. In my opinion, the value of the land if utilized for reservoir purposes, the market value of that land, as between a willing buyer and a willing seller, for reservoir purposes, is $100.00 per acre, and the improvements thereon shall be paid in addition to that $100.00.''

The foregoing excerpts illustrate the general trend of the testimony elicited from the defendants' witnesses upon cross-examination, save and except as to the few witnesses on the part of the defendant who testified only as to lands not lying below the 730-foot contour line, and constitutes the basis of the appellant's motion to strike from the record the opinions of the witnesses as to market values testified to upon direct examination. In 10 Cal. Jur., page 1020, it is said: ''Where a witness testifying as to value, bases his opinion entirely upon incompetent and inadmissible matters, or shows that such matters are chief elements in the calculations which lead to his conclusions, his testimony should be rejected. This applies with great force where the opinion is based upon pure speculation. Thus, in a proceeding to condemn land for reservoir site, estimates of value based upon speculative matters, increases of population, extension of water system, and the profits which would result from the distribution and sale of the water, are not admissible.'' The objectionable basis, if it exists, is made to appear in some of the answers given by the witnesses upon cross-examination. However, in these answers we do not find anything which indicates that the opinion of any one of the witnesses is founded upon mere speculation; they all speak from experience, as to the adaptability of the

premises for reservoir purposes. It is true they all speak of lands taken as a whole, and not as to individual parcels. This goes only to the weight of the testimony, if the testimony value of the different parcels for reservoir purposes is to be considered in union with other lands. There is nothing in any of the answers which takes into consideration increases of population or extension of water systems. No witness attempted in this case to figure out the profits of the enterprise, but several of the witnesses, upon cross-examination, stated that they thought an intending purchaser would be justified in paying $100 an acre for the land, for the purposes for which it was best adapted. One or two of the witnesses testified that there was a growing inquiry for reservoir sites, and that he thought the lands could be sold for the figures named, within a reasonable time. The words "reasonable time," we think, bear the proper interpretation of the time required to reasonably launch or dispose of projects to which the witness was referring, and not merely the days or weeks that might be required to sell the land for grazing purposes. The appellant, in this particular, quotes from the case of *San Diego Land Co.* v. *Neale*, 88 Cal. 50 [11 L. R. A. 606, 25 Pac. 978], as follows: "Market value is to be the measure of damages, and evidence of value for a special purpose is only to be considered as an element of the question. Neither the value in use to the plaintiff nor to the owner is to govern."

This quotation is correct so far as it goes, but it is evident that if the owner is making only a minor use of the premises he cannot be deprived of its value for a major use, if that major use gives it a higher market value, irrespective of whether the owner does or does not utilize the property for the purposes which give it its major value. If the quotation means that because an owner uses premises only for grazing sheep he is not to be deprived of the market value of the premises given to it for some other special use to which it is peculiarly and highly adaptable, then the quotation is correct. In other words, neither the use nor the nonuse by the owner determines value. What we are here stating is more clearly set forth in the case of *Spring Valley* v. *Drinkhouse*, 92 Cal. 531 [28 Pac. 684]: "It may be adapted for a reservoir site, but its value for such a purpose

would be qualified by the prospect, greater or less, of anyone seeking to build such a reservoir. Its market value is affected by such contingency, but is not to be determined by the fact that the party seeking to condemn it has already determined to build a reservoir. To allow that element to enter into the computation would be to make the plaintiff's necessity the owner's opportunity.'' That is another way of saying that the value of the land for the purposes for which it is best adapted depends upon the prospect, greater or less, of anyone seeking to procure such land for the purpose for which it is best adapted. We think it may also be properly stated that because there are fewer purchasers looking for reservoir sites than for agricultural or grazing lands does not preclude the court from taking into consideration the major availability of the lands, when determining their market value.

In *City of Oakland* v. *Parker*, 70 Cal. App. 295 [233 Pac. 68], and in 10 Cal. Jur., page 338, it is said: ''In proceedings for the condemnation of land, the present market value thereof taken is the measure of damages. The phrase 'market value' is synonymous with actual value. In determining market value, the test is not value for a special purpose, but fair value in view of all the purposes to which the property is naturally adapted. Market value is the highest value in terms of money which the land will bring if exposed for sale in the open market, with a reasonable time to find a purchaser, buying with full knowledge of all the uses and purposes to which it is adapted, and for which it is capable of being used.'' The term ''reasonable time'' must be interpreted in the light of all the circumstances affecting the sale of the land and the efforts required to make sale of like property. (*Santa Ana* v. *Harlan*, 99 Cal. 542 [34 Pac. 224].)

A reasonable time within which to find a purchaser looking for a particular quality or kind of land adaptable to a particular purpose is not, and cannot be, held a proper definition or limitation of time when applied to purchasers seeking land for an entirely different purpose. As we have said, the reasonable time and open market, as applied to the sale and purchase of grazing lands, is entirely different from the reasonable time and price to be applied where one is

seeking lands suitable for raising asparagus, sugar beets, or other like products having great value. In other words, because a purchaser looking for land for only a minor or less valuable purpose may be more quickly found than one seeking lands having a more valuable adaptability we think cannot be taken as the reasonable time and proper limitation when applied to the latter purchaser. We think "reasonable time" must be construed in connection with all the conditions and circumstances affecting the market value and the extent of the demand for the property involved, possessing the adaptability shown to exist. In the principal case of *San Diego Land Co.* v. *Neale,* 88 Cal. 50 [11 L. R. A. 604, 25 Pac. 977], heretofore cited, we find the following statements: "The question was not what the property was worth to a person intending to acquire it and the damsite and the remainder of the reservoir by purchase or condemnation for the purpose of supplying water over the territory tributary to the stream, but what was the market value of the property itself. In other words, what the defendants could obtain for their land if it had been offered for sale in the market, a reasonable time being given within which to make the sale. . . . So far as the value of the land in controversy may have been increased to purchasers generally by the construction and use of the plaintiff's dam and reservoir, or as a part of the entire reservoir site, such facts should be considered, but the value of the land, when used in connection with the plaintiff's land, cannot be taken as a criterion, for this would be taking the value to the plaintiff as a measure of compensation. The jury had a right to consider the fact, in determining the market value, that the land in controversy was in proximity to a damsite, and to consider its adaptability for reservoir purposes, and to determine whether or not its market value had been enhanced by improvements put upon adjoining property. But for the reason stated, its adaptability for reservoir purposes should not have been considered in connection with such damsite and other adjacent lands. . . . It is sufficient to say that any facts showing the nature of the land in controversy and its adaptability for reservoir purposes, may be shown. The area of the watershed and the amount of water were matters proper to be considered; for a reservoir would be useless without water. That there was land irrigable from the reser-

voir and cities and towns which were being supplied with water from wells, would likewise tend not only to show that it was a practicable reservoir site, but bearing directly upon its value. The condition of the property, the uses to which it may be put, having regard to the existing advantages for making a practical use of the property, and such advantages as may be reasonably expected in the immediate future, are all matters for consideration in estimating the value of the lands.'' (*Mississippi & River Boom Co.* v. *Patterson*, 98 U. S. 403 [25 L. Ed. 206, see, also, Rose's U. S. Notes].) The reference in the foregoing quotation to the ''damsite and adjacent lands'' is understandable when read in connection with the instructions of the trial court, which, in effect, told the jury that the probable profits of the uses to which such property was being put might be considered in fixing the value of defendants' land.

Before considering whether authorities bearing upon the character of testimony that may be introduced in eminent domain proceedings seeking land for reservoir purposes, we will review the cases cited by the appellant in support of its contention that such testimony is wholly inadmissible in this case by reason of the fact that the land is owned in different parcels by a number of persons, the contention being that where a union of the lands can only be accomplished by the intervention of eminent domain proceedings, the owners of the land are not entitled to share in any enhancement of their property by virtue of the expected exercise of that power. The principal cases where this subject has been considered are those involving the Ashokan and Medina Valley reservoirs. In applying the rule stated in the cases about to be referred to, it is necessary to keep in mind the distinction between instances where the very nature of the case precludes a possibility of a union of the lands without the exercise of eminent domain, that is, where there appear obstacles which would reasonably be insuperable without the exercise of such power, and instances where such apparently insuperable obstacles do not appear, and nothing is set forth in the record indicating that any attempt has been made to unite the lands, other than by eminent domain proceedings. In other words, if the fact of the practical impossibility of uniting the lands does not appear from the very circumstances surrounding the case,

the appellant cannot exclude the testimony as to the adaptability of the lands for reservoir purposes simply by instituting eminent domain proceedings. A careful consideration of the cases cited, we think, shows that the broad application of the rule as contended for by the appellant is unsupported. In *Medina Valley Irr. Co.* v. *Seekatz*, 237 Fed. 805, the circuit court of appeals of the fifth circuit, in passing upon this question, holds as follows: "It is not suggested that the defendant's land, standing by itself, was eligible as a water storage reservoir site. The fact that it was so situated as to be available for a union with other lands to make up a reservoir site may have had effect in adding to the amount obtainable for it by the owner from someone desiring to buy it. It was open to the defendant to prove the market value of his land by whatever circumstances or influences that value may have been affected. But in the circumstances of the case the questions mentioned were calculated to elicit, and did elicit, estimates of value based not upon a knowledge of what the land, as the defendant owned it, was worth, but upon opinions as to what it was, or would be worth as a part of a reservoir site, whether the union of all the lands required for that purpose could or could not be brought about without an exercise of the power of eminent domain. The admission in evidence of such estimate of value involved the hypothesis that the defendant was entitled to the value which was added to his land by the condemnation of it, together with other lands, in behalf of another. Such estimates were based upon a consideration of contingencies which were too remote and speculative to have any legitimate effect upon the valuation of the land as it was owned by the defendants, and the admission of such evidence by them involved the unwarranted assumption that the defendant was entitled to share in an enhancement of value resulting from an exercise of the power of eminent domain." The question which called for this ruling is in these words: "Q. Assuming that below plaintiff's lower or diversion dam there is approximately 100,000 acres of land that could be put under irrigation by proper canals and ditches; that plaintiff's reservoir for impounding water contained 6790 acres; that defendant's land sought in this case to be condemned from part of said reservoir; that the water supplied by said reservoir was sufficient

to annually irrigate over 100,000 acres of land; that 58 acres of defendant's land was in actual cultivation; 192 acres was susceptible of cultivation, and the remaining, grazing land. What, in your opinion, is the value of the entire tract of land sought in this case to be condemned?" This question was asked as a part of defendant's testimony in chief, fixing the valuation of the lands sought to be condemned. The question shows clearly that the court was ruling upon a question which comprehended a completed project and the valuation of the defendant's property as a part of the completed project after it had been united with other lands and subjected to the purposes for which the condemnation proceedings were being had. The language of the court, however, when scrutinized, does not indicate that the court intended to exclude testimony as to the adaptability of lands for reservoir purposes in condemnation proceedings. It only, in fact, holds that the value, added to the land in use by the condemnation proceedings, was not to be considered. There is nothing in the ruling of the court which excludes testimony as to any element which added value to the land as it stood irrespective of the action then being tried.

In the principal case of *City of New York* v. *Sage*, 239 U. S. 57 [60 L. Ed. 143, 36 Sup. Ct. Rep. 25], the supreme court of the United States holds: "The decisions appear to us to have made the principles plain. No doubt when this class of questions first arose, it was said in a general way that adaptability to the purposes for which the land could be used most profitably was to be considered, and that is true. But it is to be considered only so far as the public would have considered it if the land had been offered for sale in the absence of the city's exercise of the power of eminent domain. The fact that the most profitable use could be made only in connection with other land is not conclusive against its being taken into account if the union of properties necessary is so practicable that the possibility would affect the market price. But what the owner is entitled to is the value of the property taken, and that means what it fairly may be believed that a purchaser, in fair market conditions, would have to give for it in fact; not what a tribunal, at a later date, may think a purchaser would have been wise to give, nor a proportion of all the advance due to its

union with other lots. The city is not to be made.to pay for any part of what is added to the land by thus uniting it with other lots, if that union would not have been practicable or been attempted except by the intervention of eminent domain. Any rise in value before the taking, not caused by the expectation of that event, is to be allowed, but we repeat, it must be a rise in what a purchaser might be expected to give.'' The recital of facts preceding the opinion from which we have just quoted shows that city lots were involved and that there were several hundred parcels of land necessary to be taken by the city of New York for the purposes of creating a reservoir. The facts appearing in this case are more fully disclosed in the opinion of the courts below, but the different recitals establish clearly, and we think warranted the court holding, as a matter of law, that there was no practicable means of uniting the lands other than by eminent domain proceedings. Even with that in view the supreme court of the United States does not by its ruling exclude or remove from consideration testimony as to the adaptability of the land for any purpose. In fact, only excludes, as in the Medina case, the consideration of the enhanced value which the land might be given by reason of its union with other lands by condemnation proceedings. It is apparent, of course, that a city lot which must be joined to hundreds of other parcels (we think the record shows between 900 and 1000), as a matter of fact precludes a possibility of any value being added thereto by reason of its so-called reservoir adaptabilities when standing alone.

In the case of *McGovern* v. *City of New York*, 229 U. S. 363 [57 L. Ed. 1228, 46 L. R. A. (N. S.) 391, 33 Sup. Ct. Rep. 876], the question was again before the United States supreme court, and here again the court did not exclude testimony as to adaptability of lands for reservoir purposes. The court, in fact, only held that (quoting from the syllabus) : ''An award to the owner of one of many parcels of land taken by eminent domain for a site for a reservoir for a municipal water supply cannot be said to deny due process of law, where made without prejudice, in due form, and after full hearing, because the Commissioners and courts refuse to take into consideration the value of the land as

a part of a natural reservoir site." In so holding the court further uses the following language: "The plaintiff in error relies upon cases like *Mississippi & River Boom Co.* v. *Patterson,* 98 U. S. 403 [25 L. Ed. 206], to sustain his position that while the valuation cannot be increased by the fact that his land has been taken for a water supply, still it can be by the fact that the land is valuable for that purpose. The difficulties in the way of such evidence and the wide discretion allowed by the trial court are well brought out in *Sargent* v. *Merrimac,* 196 Mass. 171 [11 L. R. A. (N. S.) 996, 124 Am. St. Rep. 528, 81 N. E. 970]. Much depends on the circumstances of the particular case. We are satisfied on all the authorities that whether we should have agreed or disagreed with the commissioners, if we had been valuing the land, there was no such disregard of plain rights by the courts of New York as to warrant our treating their decision, made without prejudice, in due form, and after full hearing, as a denial by the state of due process of law."

In *United States* v. *Chandler-Dunbar W. P. Co. et al.,* 229 U. S. 51–53 [57 L. Ed. 1063, 33 Sup. Ct. Rep. 667], where an allowance had been made of $15,000 as strategic value, the court held: "The 'strategic value' for which $15,000.00 has been allowed is altogether speculative. It is based not upon the actual market value for all reasonable uses and demands, but the possible worth of the property to the government. A 'strategic value' might be realized by a price fixed by the necessities of one person buying from another, free to sell or refuse, as the price suited. But in a condemnation proceeding, the value of the property to the government for its particular use is not a criterion. The owner must be compensated for what is taken from him; but that is done when he is paid its fair market value for all available uses and purposes." (Citing a number of cases.) While the natural location of the lands involved in this proceeding has been very fully disclosed, and its adaptability for all purposes that would give it value testified to by different witnesses, there is nothing in the record which indicates that the defendants are taking advantage of any strategic value or profiting by the necessities of the City of Stockton. It is not an instance of where a city is seeking the only available water supply, nor does the record

show that the City of Stockton could not be protected from flood waters by other available means, as by building a wide and straight channel conveying the same directly to the sea. It is common knowledge that unused reservoir sites available for development are becoming fewer and fewer in number in the state of California. It is likewise common knowledge that great progress has been made in the acquiring and developing of reservoirs for the purpose of storing and conserving for irrigation and power purposes the flood waters that come down from the western slope and foothills of the Sierra Nevada mountains, and whether the defendants, through good fortune or good judgment, became possessed of lands valuable and adaptable for reservoir purposes, the cases which we have cited, and relied upon by the appellant, to exclude testimony in relation thereto, we construe as holding exactly contrary when applied to the circumstances here presented. There is nothing in the record indicating that any attempt whatever has been made to unite the lands in one parcel without resort to eminent domain proceedings. To hold that testimony as to the adaptability of the lands for reservoir purposes inadmissible under the circumstances would be to hold that a plaintiff, by simply instituting eminent domain proceedings, can thereby render such testimony incompetent and exclude it from consideration by either court or jury.

In the case of *Mississippi & River Boom Co.* v. *Patterson,* heretofore referred to, the supreme court of the United States, speaking through Justice Fields, holds such testimony admissible. The property to be taken was available and adaptable for boom purposes, not as it stood alone, but as a part of the boom about to be created. In speaking of this phase of the controversy the court there said: "The position of the three islands in the Mississippi, fitting them to form, in connection with the west bank of the river, a boom of immense dimensions capable of holding in safety over twenty millions of feet of logs, added largely to the value of the lands. The Boom Company would greatly prefer them to more valuable agricultural lands, or to lands situate elsewhere on the river; as, by utilizing them in the manner proposed, they would save heavy expenditures of money in constructing a boom of equal capacity. Their adaptability for

boom purposes was a circumstance, therefore, which the owner had a right to insist upon as an element in estimating the value of his lands.'' This case has been frequently cited, and we think admits the testimony as to the adaptability of lands for reservoir purposes in all cases where nothing further appears than the simple fact of the institution of eminent domain proceedings.

In *City of Stockton* v. *Vote, supra,* this court quoted from the opinion of *Gearhart* v. *Clear Spring Water Co.,* 202 Pa. 292 [51 Atl. 891], to this effect: ''The location alone fixed the value. Whether the land was available for the use testified to was a question of fact, and the argument directed to the court against the admission of the testimony should have had great weight with the jury in determining the value. The question was submitted with instructions that if the land, by itself, could not be used for building a reservoir, an estimate of its value for that use in connection with other properties which the plaintiff did not own, and could not acquire, should be disregarded by the jury.'' This court then said: ''If it should appear in the case at bar that there are other lands which the defendant does not own, and cannot acquire, then and in that case, which is a fact for the jury to pass upon, the value of the lands for reservoir purposes should be eliminated.''

In *Brack et al.* v. *Mayor and City Council of Baltimore,* 125 Md. 378 [Ann. Cas. 1916E, 880, 93 Atl. 994], where it was sought to condemn land for storage purposes to supply a city with water, it was alleged that plaintiff's land, through which the strip was condemned, was specially adapted for reservoir purposes. The trial court excluded evidence of the special adaptability of the land for such uses, on the ground that the owner had no right to impound waters flowing through his land, etc., without the consent of the city as a lower riparian proprietor, and, therefore, there was no actual increase in the value of the land by reason of its abstract availability. This ruling was reversed, and the supreme court of Maryland stated that ''in the absence of affirmative showing in the record that the use of the land for reservoir purposes would necessarily involve an invasion of the riparian rights of the city, and the offer of proof being decisive to show that the land had an inde-

pendent availability for reservoir purposes, evidence as to its value for such use was improperly excluded.'' While the court uses the expression ''independent availability,'' a reading of the case shows that the eminent domain proceedings were instituted for the purpose of using the lands in connection with other lands and water rights belonging to the city.

In *Spring Valley Water Co.* v. *Drinkhouse*, 92 Cal. 528 [28 Pac. 681], reversed for other reasons, the court, nevertheless, set forth the rule which we think supported by reason and authority when defendant's land is only part of a reservoir site. It is there said (quoting from the syllabus) : ''In an action to condemn land for a reservoir site, where the land sought to be condemned, by reason of its situation, and because it is a part of a basin adapted for reservoir purposes, would be regarded as more valuable by purchasers generally than if it did not possess such advantages of location and adaptability for use as a reservoir, the plaintiff should be permitted to show by the testimony of competent witnesses the value of the land for reservoir purposes.'' The word ''plaintiff'' should read ''defendants,'' as applied to the case at bar.

In the two cases of *San Diego Land Co.* v. *Neale, supra,* the lands under consideration were only a part of a larger reservoir site. To think the authorities above considered support the opinion of this court in the *City of Stockton* v. *Vote, supra,* to the effect that unless the testimony shows the impracticability or the insuperability of uniting several parcels of land by reason of the very nature of the situation, the practicability of uniting the lands in one parcel for reservoir purposes is a question of fact to be determined and considered by the trial court in awarding damages, taking into consideration all the purposes for which the lands may be adaptable or which may give them value. We find nothing in the record in this case showing either insuperability or impracticability. So far as the record discloses, no attempt was made in this case to unite the lands in one parcel by other than condemnation proceedings, and the mere fact that there may be highways running through the proposed reservoir site does not, in our opinion, create either an impracticability or an insuperability which may be declared such as a matter of law. We hold, therefore, that in this

case testimony as to the adaptability of the several parcels of land for reservoir purposes was admissible. The question then recurs, did the court err in refusing to grant the appellant's motion to strike out the opinions of defendants' witnesses as to the market value of the respective parcels of land, the motion being based upon the testimony elicited upon cross-examination, illustrations of which we have set forth? That some portions of the testimony elicited upon cross-examination might have been stricken out if a motion had been made for that purpose, may be admitted without further elaboration, but in view of the comprehensive motion made in each instance, a comprehensive consideration of the testimony becomes necessary, and if, upon the whole, the motion should be denied, the appellant has no grounds for complaint.

In determining values in actions of this kind where, for certain purposes, the lands are extremely valuable, and for other and different purposes, of little or no value, courts are always confronted with many difficulties, the chief of which is sometimes the apparent fact that there is no market value, in the strict sense of the word, but this does not entitle the plaintiff to take the lands without paying just compensation. In the case of *Portneuf-Marsh Valley Irrigation Co.* v. *Portneuf Irrigating Co.*, 19 Idaho, 483 [114 Pac. 19], this difficulty is aptly stated: "It is often difficult to determine the market value of the property, for the reason that there may be no general demand for the same, or it may be that the property is only valuable for a specific purpose, as was the case here, and the value can only be estimated upon the basis of the fitness of the property for the specific use on account of its formation, its location, or other specific natural or artificial adaptabilities to the use for which it is sought. In cases, therefore, where no general market value can be ascertained, these latter elements must be taken into consideration, and are proper subjects of inquiry in arriving at the value of the property. 'Generally speaking,' said the supreme court of Iowa, in *Ranck* v. *Cedar Rapids*, 134 Iowa, 563 [111 N. W. 1027], 'the true rule seems to be to permit testimony of all the varied elements of value; that is, all the facts which the owner would properly and naturally press upon the attention of a buyer to whom he is negotiating a sale, and all

other facts which would naturally influence a person of ordinary prudence desiring to purchase.'" (See, also, *North American Tel. Co.* v. *North Pac. R. R. Co.*, 254 Fed. 417.)

In *Marin Water & Power Co.* v. *Railroad Com.*, 171 Cal. 706 [Ann. Cas. 1917C, 114, 154 Pac. 864], the court, after considering the admissibility of testimony before the commission, which set forth the quantity of rainfall per annum, the amount of water that could be stored, and practically all of the elements going to make up reservoir values, or the value of lands adaptable for such purposes by reason of a topographical location and quantity of rainfall and extent of watershed, concluded its opinion as follows: "If the undisputed evidence had shown that the property had a special additional value, as for example, that by reason of the situation and topography of a parcel of the land, a quantity of water could be annually caught, stored thereon and sold at a profit, and that the commission had refused to allow such value, as a part of the compensation fixed, it may be conceded that this would have been a deprivation of property without due process of law, and disregard of the petitioner's right to just compensation, and, therefore, a violation of both Federal and State Constitutions." (Citing a number of authorities.) The court then found that the commission did not refuse to allow compensation for such added value. If the exclusion of such testimony from consideration by the Railroad Commission would work a deprivation of property without due process of law, and, therefore, was violative of the federal and state constitutions, how can it be said that testimony brought out by cross-examination in the case at bar, as to all of the physical capacities and adaptabilities of the land sought to be condemned, and even their value therefor, on such examination, furnishes any basis for striking out the witnesses' opinion, given upon direct examination, as to the general market values. It would be no less a deprivation of property rights by the courts than by the Railroad Commission, if such testimony were excluded, or furnished the basis for the exclusion of the answers of the witnesses to the general questions.

In the case of *Tracy* v. *City of Mount Pleasant*, 165 Iowa, 435 [146 N. W. 78], where the court had under consideration eminent domain proceedings to condemn land which

constituted a part of a reservoir site, we find the following (quoting from *Russell* v. *St. Paul etc. Ry. Co.*, 33 Minn. 213 [22 N. W. 380]) : "If, therefore, the land sought to be condemned in this action, by reason of its situation and because it is a part of a basin adapted for reservoir purposes, would be regarded as more valuable by purchasers generally than if it did not possess such advantage of location and adaptability for use as a reservoir, the defendant should be permitted to show its value with reference to such facts, by the testimony of competent witnesses." And then in that case, as here, with reference to the cross-examination of witnesses who had testified as to the market value, and the cross-examination elicited much testimony as to the peculiar special values by reason of adaptability and expressed itself in these words: "Undoubtedly, inquiry would be proper, on cross-examination, as to what purpose a witness thought the property available for, and his opinion of its market value for such purpose. If so, it would not seem that error might be predicated on permitting this to be drawn out on direct examination." The last sentence of this quotation is inapplicable to the present case by reason of the fact that all of the testimony to which we are referring was brought out upon cross-examination.

In *Southern Pacific Co.* v. *San Francisco Savings Union*, 146 Cal. 290 [106 Am. St. Rep. 36, 2 Ann. Cas. 962, 70 L. R. A. 221, 79 Pac. 961], the court, in passing upon a motion to strike out direct testimony, based upon what the witness stated upon cross-examination, ruled as follows: "Appellant insists that the trial court heretofore granted its motion to strike out the testimony of the witness Rusk, called on behalf of defendant, as to the market value of the property in question, on the ground that it appeared from his cross-examination that his testimony in that respect was merely conjectural and speculative. We do not think so. The witness fully qualified himself, on direct examination, to give an opinion on the subject. On cross-examination he testified as to the matters which would influence him from the standpoint of a contemplating buyer, in determining the market value of land in an oil-bearing territory; the number of wells which could be economically placed on the amount of land taken, and ordinarily losses therefrom, and the general relation of outlay to income. On cross-examination he

entered into no details nor gave any estimates. These were matters which, it appears to us, would naturally be taken into calculation in forming a public and general estimate of the value of land of this character, and which would influence the minds of sellers and buyers with relation to it, and to which the witness could properly testify." It was there said that because the witness did testify as to some matters on cross-examination which were speculative in character, would not have justified the striking out of his testimony, although such particular matters might have been eliminated upon proper motion. Just as in the case at bar, some of the answers elicited upon cross-examination may be admitted to be more or less speculative, but cannot be taken advantage of now.

In the case of *Brack* v. *Mayor and City Council of Baltimore, supra,* in addition to what we have said as established by that case, we find it authority in support of the testimony introduced in the case at bar. We quote the following: "If we were to preclude the inquiry which the defendant proposes on that subject (availability of the land for reservoir purposes), we could not be certain as the case is now presented, that his rights were receiving the full measure of recognition to which they may be justly entitled. In our opinion, the defendant should have the opportunity, if he desires, to prove, if he can, that the property being condemned has an independent value and marketability as a reservoir site." As heretofore stated, the rule seems to be that upon direct examination the value for a specific purpose may not be stated, but in this case holding such testimony admissible upon direct examination is certainly good authority for holding that such testimony is proper when elicited upon cross-examination, and if proper testimony to be considered, it furnishes no basis for striking out testimony given upon direct examination which conforms to the accepted rule in California.

A considerable portion of the testimony upon cross-examination was directed to what a purchaser would be willing to pay for the property, who was seeking it for a particular purpose, or for the particular purpose in the minds of the witnesses which makes the decision in the case of *Ely* v. *Conan*, 91 Minn. 127 [97 N. W. 737], pertinent, to wit: "Any evidence is competent, and any fact proper to be

considered which legitimately bears upon the market value of the property." (Citing cases.) "That by market value of property is meant what purchasers generally would pay for it; not what men would pay who had no particular object in view in purchasing, and no definite plan as to the use to which to put it. The owner has a right to its value for the use for which it would bring the most in the market." That is, in substance, what the witnesses were testifying to upon cross-examination, that it would bring the most in the market for purchasers who had in view its chief adaptability.

In *Portland & S. Ry. Co.* v. *Skamania Boom Co.*, 59 Wash. 191 [109 Pac. 814], the supreme court of Washington held that a witness having knowledge of one purpose or adaptability for which the land was valuable might testify as to such value. There it was contended on the part of one of the parties that it was chiefly valuable for agricultural purposes. On the part of the other party, that it was chiefly valuable for boom purposes. The court solved the question in this manner: "If the jury should find that the land is chiefly valuable for booming purposes, they would, of course, disregard testimony tending to show its value for agricultural purposes, and if they found it chiefly valuable for agricultural purposes, they would disregard the testimony tending to show its value for booming purposes. The witnesses were therefore competent to give testimony on a material issue in the case, and the objection to their competency was properly overruled."

In *Gearhart* v. *Clear Spring W. Co.*, 202 Pa. 292 [51 Atl. 891], where the location of the land fixed its value, peculiarly for use as an ice-pond, expert witnesses were permitted to state their opinion of the market value of the land, based upon such uses.

In *Idaho Farm Dev. Co.* v. *Brackett*, 36 Idaho, 748 [213 Pac. 696], the supreme court of Idaho reviewed the different questions here involved, citing many authorities in relation to the rule followed in different jurisdictions, and a number of cases holding that it is permissible to show the market value, and that while the land may be shown to be valuable for a specific purpose, the money value of the specific purpose may not be shown upon direct examination; and comes to this conclusion: "We conclude that if the land sought to be condemned is shown to have a special value for a specific

purpose, the landowner may show whether it has a market value for that purpose, and if so, what it is." The cause was reversed for other reasons, and testimony as to the market value of other reservoir sites held inadmissible. In the Idaho case the court approves the rule admitting such testimony upon direct examination. By much stronger force would it be an authority in support of the statement that the admission of such testimony upon cross-examination is insufficient upon which to base a motion to strike out an estimate of value given upon direct examination.

The record shows that the trial court did not award damages in any case equal to the opinion given by any of the expert witnesses, either upon direct examination or upon cross-examination. The cross-examination elicited from the expert witnesses a statement from every one of them that the market value of the lands for reservoir purposes was $100 per acre. The award made by the court was in the sum of about $80 per acre. Thus the ruling of the court in denying the appellant's motion cannot be held prejudicial, because it left in the record a great volume of testimony, elicited by the appellant, amply sufficient to support the award in each case. In other words, the cross-examination brought out the possibilities considered by the supreme court of Massachusetts in the case of *Moulton* v. *Newburyport Water Co.*, 137 Mass. 163. It is there said: "The petitioners were not entitled to swell the damages beyond the actual fair market value of the land at the time, by any consideration of the chance or probability that in the future authority might be acquired, by legislation or purchase, to carry the water in pipes to neighboring towns. Such chance or probability must needs enter to some extent into the market value itself; and so far as the market value might be increased thereby, the petitioners were entitled to the full benefit of it. If there were different customers who were ready to give more for the land on account of this chance, or if there were any other circumstances affecting the price which it would bring upon a fair sale in the market, these elements would necessarily be considered by the jury or by a witness in forming an opinion as to the market value. Nevertheless, the value for these special and possible purposes is not the test, but the fair market value of the land in view of all the purposes to which it was naturally adapted." (Citing cases.) The

court had thus placed before it all of the special and possible purposes for which the lands were adapted, and which would necessarily be considered by anyone inquiring into the possibilities of the land or the elements which would tend to give it an increased market value, and the purposes for which it was chiefly valuable, by reason of such peculiar adaptability.

While the record contains only general testimony as to the demand for reservoir sites, and no specific testimony indicating a present demand for the particular reservoir site in question, the record does show what we think the court may take knowledge of—the fact that water development in the state is causing an increased inquiry for available reservoir sites, and that the number of undeveloped reservoir sites are becoming fewer. This is due to the fact that nature, and not man, has marked out the course of the mountain streams and fixed the available reservoir sites thereon. It is common knowledge that the reservoir sites along the Merced, the Stanislaus and the Tuolumne Rivers, occupying the same general territorial vicinity, are being rapidly developed and utilized, and that irrigation districts and power companies are looking more and more to the mountains where there is available area to collect the winter rains as sources of water supply.

Appellant stresses the ruling in the case of *Sacramento R. R. Co.* v. *Heilbron,* 156 Cal. 408 [104 Pac. 979], as conclusive in favor of its contention that the refusal of the trial court to strike out the testimony of the expert witnesses on the subject of market value constitutes good ground for reversal. An excerpt from the testimony of the witness McWilliams, referred to in the opinion in the Heilbron case, is set out in appellant's brief. The salient features of the objectionable testimony are found in the following questions and answers: "'Q. Now, you say you stated to Mr. Seymour, in your judgment this land would sell, February 14th, in the market, for six or seven hundred dollars, and afterwards, between seven and eight hundred dollars. What do you mean? A. $700.00. Q. Why? A. I said— Q. Between six and seven hundred, and afterwards, you said between seven and eight hundred? A. I said, for the purpose that I might use it myself; yes. Q. You mean to say that if a man wanted it to do a nursery business, he might be willing to

pay that much? A. I believe he would if he knew the quality of the soil and resources. Q. Suppose there was no man that wanted to go in the nursery business who wanted to buy it, what would it be worth? A. For growing hay, I don't think it would be worth as much. Q. You base your opinion of it, as worth that much, upon the fact that a man who wanted it would buy it for flowers—nursery stock business? A. For the purpose that I have already stated, yes. Q. (By the Court): Is that the basis of your valuation, Mr. McWilliams, or is the basis of your valuation founded upon the fact that you know what the land will do, and therefore, you are of the opinion that it would sell on the market for the price you have named? A. Founded on the facts which I have already told you it would produce. Q. You don't know of any sales down there, do you? You are not basing this opinion on any sales of property like the Heilbron property? A. No, sir, not any sales, any sales that I know of that have been made. Q. You are basing your opinion of the market value entirely upon the fact that you think it would sell for that much for that particular purpose, if a man wanted to use it? A. Yes, sir.'' In dealing with this testimony, the supreme court, in its opinion, indicates that there was testimony lacking which is not completely wanting in the case at bar. The court, in the Heilbron case, said: ''McWilliams' evidence as to the price which he thought would be paid for the land by one desiring it for nursery purposes, was not admissible. It was not even contended that McWilliams qualified himself to testify as to the market value, and his testimony amounted to no more than that the land was suitable for nursery purposes, and that for such purpose a purchaser could be found who would pay so much per acre. Here is an excellent view of the domain of speculation which is open by the introduction of testimony such as this.'' The ruling of the trial court striking out the testimony of the witness was upheld. If nothing more appeared in the record in the case at bar than two or three answers given by the witness O'Shaughnessy, in the beginning of the excerpt of his testimony which we have set forth, under the Heilbron case we would be under the necessity of holding the refusal of the trial court to strike out his testimony erroneous, but whether of such prejudicial nature as to

necessitate reversal, in view of section 4½ of article. VI of the constitution, is another matter. The cross-examination of the witness O'Shaughnessy discloses that after having laid an apparent foundation, based upon the Heilbron case, for a motion to strike out his testimony, all the facts and circumstances which the court, sitting without a jury, might properly consider and weigh in determining whether the availability of the lands and premises sought to be condemned for reservoir purposes were so available for that purpose as to increase their market value over and above that which ordinary grazing lands or similar agricultural lands lying just outside of the contour lines of the reservoir basin might have. With these facts all laid before the court, we cannot very well come to the conclusion that the trial court in making its award was prejudicially influenced. We do not need to go into a discussion of the weight or value of opinion evidence, further than to state, in the language of the supreme court of Minnesota, in the case of *City of Ely* v. *Conan, supra:* "Ordinarily, the admission or exclusion of opinion evidence where it is not of a determinative character, is not regarded as sufficient to justify a reversal." And, further, as to the admission or exclusion of opinion evidence, we wish to call attention to the direct and cross-examination, in that case, as set out in the opinion of the court appearing on page 738 of the 97th volume of the Northwestern Reporter [91 Minn. 127], and the holding of the court that testimony practically similar to that which was introduced in this case was insufficient to warrant reversal.

We may also call attention to the fact that the trial court was not bound by the testimony of the expert witnesses, and that in every instance to which our attention has been called a very material less value was found by the trial court than testified to by the experts, which would indicate that the trial court took into consideration all the testimony introduced in the case in endeavoring to arrive at the fair market value of the property, instead of giving effect to the extreme views of any witness, and in so doing we think followed the rule set out in 10 Cal. Jur. 972, to wit: "The province of such testimony is only to aid in coming to a conclusion"; (referring to expert testimony) "and it does not exclude consideration of other evidence which is pertinent to the issue

involved. Even if several competent experts concur in their opinions, and no opposing opinion is offered, the jury are still bound to decide the issue upon their own judgment, assisted by the statements of the experts. . . . It is for the trial court, and not the court of review, to determine the weight to be given to such evidence.''

Even though, as claimed by the appellant, the experts were inclined to envisage a completed project, in testifying as to the adaptability of the properties concerned for reservoir purposes, the material modification made by the court in awarding damages from the values testified to by several of the expert witnesses justifies the conclusion of this court that all the difficulties of combining the several parcels in one tract were duly considered and weighed before the making of findings and the entry of judgment.

The cross-examination clearly followed the rule laid down in the case of *Santa Ana* v. *Harlan,* 99 Cal. 538 [34 Pac. 224], where it is held that great latitude should be allowed in the cross-examination of witnesses for the purpose of testing their knowledge and judgment. By this examination the experience, knowledge, and judgment of the engineers who had had to do with reservoir projects was clearly shown to the court, and the mere fact that the court allowed a greater market value than that testified to by those who understood only, and gave opinions only upon the value of the land, based upon their uses for grazing or stock-raising purposes, or even that the trial court found from the testimony a greater market value than this court would conclude from the same testimony, furnishes no ground for reversal. Again, the reasonable time element for making sale, as stated in the case of *Santa Ana* v. *Harlan, supra,* was a question for the trial court to consider. The reasonable time is defined in the Santa Ana case practically as we have heretofore set forth. In the Santa Ana case it is said: ''By the term 'reasonable market value' is meant not what the owner could realize at a forced sale, but the price that he could obtain after reasonable and ample time, such as would ordinarily be taken by an owner to make sale of like property.'' (Citing authorities.) In connection with what a witness may properly state as to adaptabilities and values of reservoir property, as well as to considering such matters when several parcels are united, we may also cite the well-considered

case of *Brown* v. *Weaver Power Co.*, 140 N. C. 333 [3 L. R. A. (N. S.) 912, 52 S. E. 954].

In action number 3176, as that number appeared in the case below, being for the condemnation of 310 acres belonging to Louis Vogelgesang and Gustave Vogelgesang, appellant contends that the court erred in relation to severance damages. The complaint mentions only 480 acres of land standing in the names of the two parties just mentioned, out of which it is proposed to take 310 acres. The two Vogelgesangs, by their answer, set forth that the 480 acres, out of which it is sought to take 310 acres, was really a part of a larger parcel containing 1,820 acres. It appears from the map set forth in appellant's brief that the 1,820 acres, irrespective of the question of ownership, lies in one continuous parcel. The contention is made by appellant that as different governmental subdivisions of said tract appear of record in the names of the different defendants, some of the tracts appearing in the name of Gustave Vogelgesang, and other governmental subdivisions appearing in the name of Louis Vogelgesang, there is not a unity of ownership. The defendants, by their answer, to which we have referred, allege that the land is in fact owned by them as partners, and the testimony set forth in the record warranted the court in finding that while the different governmental subdivisions of the tract stood of record in the names of the different defendants, it was in fact owned by the partnership. The testimony shows that the two defendants were using the tract, as described in their answer, as one parcel. Section 1248 of the Code of Civil Procedure specifies that: "If the property to be condemned constitutes only a part of a larger parcel, the damages which will accrue to the part not sought to be condemned by reason of its severance from the part sought to be condemned" shall be considered in fixing damages. Section 1246 of the Code of Civil Procedure allows all persons having an interest in the land to come in as parties.

In the case of *Perelli-Minetti et al.* v. *Lawson et al.*, 205 Cal. 642 [272 Pac. 573], the supreme court of this state adopted as its opinion the opinion of this court prepared by Presiding Justice Finch, setting forth the rule of law as to when real estate may be held to be partnership property, though standing in the names of different partners, which is applicable here. The ownership of the property

is in fact what is involved. The record shows further that the real estate used as one parcel and standing in the names of the different partners was purchased with partnership funds, while as stated in 20 Cal. Jur. 722, section 39: "A partnership cannot at law be the grantee in a deed, or hold real estate. If real property be purchased with partnership funds for partnership purposes, and conveyed to all the partners, describing them as composing a partnership, they will nevertheless take as tenants in common. . . . The title can be controlled, and the property itself sold or otherwise administered in equity, for the benefit of the firm, but until such disposition is made the legal title will remain where it is placed by the conveyance." And, as further stated in section 40: "Although at law partners are deemed to be tenants in common of firm real estate, in equity a different rule prevails. There the real purpose for which the property was acquired is considered, and under the principles of trust the court will regard real estate held for partnership purposes as personal property so far as it may be necessary to settle the equities between the firm and its creditors, or between partners and themselves. In view of equity it is immaterial in whose name the legal title to the property stands, whether in the name of one partner or the names of all." The partnership, in fact, was shown to be the owner and in the use and occupation of the 1,820 acres. That the tract was used as one parcel appears not to be disputed.

The case of *Oakland* v. *Pacific Lumber Co.*, 171 Cal. 392 [153 Pac. 705], is cited in support of the statement that unity of use should not be regarded as the controlling factor. This may be admitted, but such admission does not carry with it the correlative that unity of use should not be considered. Unity of use is considered and is a factor to be considered. This appears to be the settled rule as shown by the notes following the case of *Sharpe* v. *United States*, as reported in 57 L. R. A. 932. (See, also, 20 Cal. Jur. 737.) Unity of use is simply not alone sufficient. There must be contiguity, that is, the governmental subdivisions must in fact constitute one parcel, and not divided by either natural or artificial objects or ways so as to divide the land into two or more separate parcels. The question of ownership also enters into the consideration. The partnership being the owner, the different governmental subdivisions all being con-

tiguous and there being unity of use, we conclude that the trial court did not err in considering the whole tract as one parcel.

The final objection which we deem necessary to consider is the award of damages in the sum of $1,060 in action number 3161 as given in the court below, on account of an alleged easement in a highway appurtenant to two tracts of land, one denominated a 540-acre tract, the other a 320-acre tract. These lands are not contiguous to the lands sought to be condemned in action number 3161 above mentioned. The map shows that there is a certain highway called the Petersburg road, running through certain lands belonging to the defendants Ellingwood and Vogelgesang; that this road continues on down through the reservoir site, and at a point distant from the lands sought to be condemned another highway leading past the 540-acre tract connects with the Petersburg road. From the highway so connecting with the Petersburg road, at a very considerable distance, a trail leads off from, and connects with, the 320-acre tract. The closing of the Petersburg road, as found by the trial court, does not prevent ingress and egress to either the 540-acre tract or the 320-acre tract. In other words, both those tracts have other means of reaching the state highway. The defendants allege that the road through the Petersburg road is a private way. The testimony set forth in the record would lead us to the conclusion that it is a public highway. But, irrespective of whether it is a public or a private highway, the record shows that neither the 540-acre tract nor the 320-acre tract is so connected with, or contiguous to, anything involved pertaining to the condemnation of the lands described in action number 3161, as to furnish a basis for an award of damages herein. The reasoning which would award damages to these lands would award damages to lands owned any number of miles away, if the defendants were accustomed to travel over highways leading therefrom to the lands condemned. The sum of $1,060 allowed in action number 3161 just referred to should be stricken from the judgment in that case, and it is so ordered. In all other particulars the judgments in the actions pending upon this appeal are affirmed.

Thompson (R. L.), J., and Finch, P. J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on March 15, 1929, and a petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on April 11, 1929.

Shenk, J., and Waste, C. J., dissented.