## In re ALBERTI.

### No. 33058–Y.

District Court, S. D. California, Central Division.

Sept. 29, 1941.

Frank P. Doherty, Maurice Gordon, William R. Gallagher, and Frank W. Doherty, all of Los Angeles, Cal., for petitioner.

Mark Watterson, of San Bernardino, Cal., for debtor.

YANKWICH, District Judge (after stating the facts as above).

The effect to be given to the findings of a referee, and, consequently, to those of a conciliation commissioner, was stated by Judge Wilbur in Weisstein Bros. & Survol v. Laugharn, 1936, 9 Cir., 84 F.2d 419, 420:

"Appellee contends that the case having been tried before the referee, and the referee having found that the claimant was entitled to possession of the canned fruit, that the District Court could not disturb the decision. This contention is based upon the familiar rule that where facts are litigated before the referee, and where the witnesses appeared before him, and a de-

cision upon the controverted facts had been made by him, the court will not ordinarily be justified in reversing the finding of the referee as to the controverted facts. In re Gordon & Gelberg [2 Cir.] 69 F.2d 81, 83; Rasmussen v. Gresly [8 Cir.] 77 F.2d 252; Remington on Bankruptcy (4th Ed.) vol. 8, 3669, p. 41; Ingram v. Lehr [9 Cir.] 41 F.2d 169, 170.

"The question here, however, is not at all one of reversal of the referee upon his determination of a factual issue. The error of the referee was in holding that because he had no jurisdiction to determine the rights of the Security First National Bank, a third party, over its objection, he should ignore that right in determining the issue between the parties as to whether or not the debtor or claimant was entitled to possession. Proof that the pledge holder was entitled to possession was proof that both the debtor and claimant were not entitled to possession. The trial court rightly held that under the stipulation the claimant was entitled to a general claim only against the debtor for the amount of $962.-04, the value of the canned fruit purchased by it which was not delivered because of the pledge."

This means that, while, on conflicting testimony, we must follow the findings of the referee (or the commissioner), when there is no conflict of testimony, or when the testimony upon which the decision is based is not legally entitled to the effect which the commissioner has given to it, there is no evidence whatsoever to sustain the commissioner.

This review presents the very simple question whether agricultural property can be appraised legally by taking into consideration one factor only, namely, productivity, under the use to which it is being put. The law of California says specifically that while the highest use to which the property can be put is a criterion of value, no value can be determined solely by such use. The Supreme Court of California has expressed this view in a long series of cases. Perhaps the classic case on the subject is San Diego Land & Town Co. v. Neale, 1888, 78 Cal. 63, 20 P. 372, 3 L.R.A. 83. I am reading from page 67 of 78 Cal., page 374 of 20 P., 3 L.R.A. 83: "The word 'value' is used in different senses. Bouvier, in his definition, says: 'This term has two different meanings. It sometimes expresses the utility of an object, and sometimes the power of purchasing

goods with it. The first may be called the value in use; the latter the value in exchange.' For the purposes of the law of eminent domain, however, the term has reference to the value in exchange or market value. There are some cases which seem to hold that the value in use to the owner is to be taken if it exceeds the market value. But it will generally be found, on a careful examination, that such cases either relate to the damage accruing to the owner from the taking, and not to the value of the property itself, or overlook the distinction between the two things. The consensus of the best-considered cases is that for the purposes in hand, the value to be taken is the market value. [Citing cases.] By which it is undoubtedly meant, not what the owner could realize at a forced sale, but 'the price that he could obtain after reasonable and ample time such as would ordinarily be taken by an owner to make sale of like property'. * * The problem, then, is to ascertain what is the market value. Now, where there is an actual demand and current rate of price, there can be but little difficulty. But in many instances (as in the case before us) there is no actual demand or current rate of price,—either because there have been no sales of similar property, or because the particular piece is the only thing of its kind in the neighborhood, and no one has been able to use it for the purposes for which it is suitable, and for which it may be highly profitable to use it. In such case it has been sometimes said that the property has no market value, in the strict sense of the term. * * * And in one sense this is true. But it is certain that a corporation could not for that reason appropriate it for nothing. From the necessity of the case the value must be arrived at from the opinions of well-informed persons, based upon the purposes for which the property is suitable. This is not taking the 'value in use' to the owner as contradistinguished from the market value. What is done is merely to take into consideration the purposes for which the property is suitable as a means of ascertaining what reasonable purchasers would in all probability be willing to give for it, which in a general sense may be said to be the market value."

The case came before the court again in San Diego Land & Town Co. v. Neale, 1891, 88 Cal. 50, 25 P. 977, 11 L.R.A. 604. On page 61 of the opinion in 88 Cal., page

980 of 25 P., 11 L.R.A. 604, I find this statement:

"In the case at bar the opinion of some of the witnesses was based on speculative and conjectural calculations of expenditure and profit for a period of five years', and others on a basis of ten years' use of the property in controversy, in connection with the property owned by plaintiff. The facts and figures relied on in support of these opinions not only threw no light on the question, but must have operated to confuse and mislead the minds of the jury. * * *

"The following authorities establish the proposition that the compensation to be awarded the owner of the land condemned cannot be based upon the value of the property to the person or company in charge of the public use, nor by its necessities, and that it is not proper to take into consideration the profits which may result from the use of the land, especially where the profits depend upon the expenditure of large sums of money in carrying out the contemplated enterprise."

■. So we have both sides of the question. Value in use to the owner is not a criterion of value. Nor is value in use to the person who seeks to acquire the property. This question does not concern us. But it is important, as determining what criteria do not govern the determination of value.

Most of these cases are condemnation cases. But they all deal with the question of value and market value and the manner of determining them.

Value in use as a criterion has been condemned in subsequent cases, among which are: Santa Ana v. Harlin, 1893, 99 Cal. 538, 34 P. 224, and Central Pacific R. Co. v. Feldman, 1907, 152 Cal. 303, 92 P. 849.[1]

One of the oldest cases in California, and one which is considered almost a classic, is Central Pacific Railroad Company v. Pearson, 1868, 35 Cal. 247, 261. Speaking of proof of value, the Court said: "The opinions of witnesses, founded upon a knowledge of the location, productiveness, or adaption of the land to other uses, not speculative, or of the market or selling price of the land in the vicinity, are legal evidence to prove its value. * * * But the opinions of witnesses who do not possess this knowledge are not. The opinions of such are worthless as a foundation for intelligent action, even in a matter of business. The business man who forms his judgment upon the opinions of others who have no knowledge of the subject of which they speak, would be obnoxious to the charge of great folly, if not lunacy; and opinions which cannot be accepted as worthy of any influence upon the action of men in the management of their business affairs, certainly ought not to be made the basis of judicial action."

These principles have been reasserted in later cases ever since.

In City of Stockton v. Ellingwood, 1929, 96 Cal.App. 708, 716, 723, 275 P. 228, 232, the Court said: "While the qualifications of the witnesses may be inquired into with considerable minuteness upon direct examination, it does not appear that testimony as to the value of lands for any special purpose may be given by the witness in dollars and cents. The witness may be questioned as to every adaptability that would give value, but his opinion must not be expressed in the general terms of so much money as the market value." Then on page 723 of 96 Cal.App., page 235 of 275 P.: "Market value is to be the measure of damages, and evidence of value for a special purpose is only to be considered as an element of the question. Neither the value in use to the plaintiff nor to the owner is to govern."

The case of Temescal Water Company v. Marvin, 1932, 121 Cal.App. 512, 9 P.2d 335, 336, is very interesting. The entire testimony of a witness was stricken because it was not based upon an understanding of the legal meaning of "market value". The opinion reads: "He described the two beneficial uses for which the land in section 35 was adapted from an engineering standpoint, and further stated that he had familiarized himself with the different uses to which land is generally adaptable, and that the land in section 35 could be put to other beneficial use, irrespective of its uses viewed solely from an engineering standpoint. The witness was then asked if he could give an opinion as to the reasonable market value of section 35, to which he gave the following answer: 'Before I answer that, I would ask whether there is any such a market

---

[1] This is also the general rule. See: 20 C.J. 727, 728; United States v. Honolulu Plantation Co., 9 Cir., 1903, 122 F. 581; United States v. Chandler-Dunbar Water Power Co., 1913, 229 U.S. 53, 80, 81, 33 S. Ct. 667, 57 L.Ed. 1063.

value for part of the river, and I reply No, so it would be a contradiction of terms if I said market value.' Counsel for respondent was then permitted to interrogate the witness relative to his qualification to give an opinion as to the market value of the land in section 35. This inquiry developed the following facts: That the witness was not acquainted with real estate values and would not attempt to testify as to such values; that in giving his opinion as to the value of the land he would base his answer in part upon the fact that the land was being considered for reservoir purposes. The court then asked the witness the following question: 'You were asked by Mr. Anderson if you knew the market value of land similar to this, what it would sell for in the market. I understood you to say you did.' Whereupon the witness replied: 'I don't think I did say anything like that.' The court then sustained respondent's objection that no proper foundation had been laid to warrant the witness giving his opinion as to the market value of section 35; the court remarking that he thought the witness had not been shown to be competent to testify as to the value of the land. Further effort was then made to qualify the witness to give his opinion as to the market value of the land in section 35. During this latter examination, the witness stated that he was able to give an opinion as to the market value of the land uninfluenced by the fact that respondent had commenced a project which involved the acquisition of a reservoir site, and that the land in section 35 would be included as a part of the reservoir site. Prior to being permitted to give his opinion, counsel for respondent was again allowed to cross-examine him touching his qualification to give an opinion as to market value of the land. During this cross examination, the witness, in reply to the inquiry what he understood to be meant by the expression 'market value,' stated that he understood it to be the price that a seller could procure for property, provided he had a reasonable time to find a buyer who was willing to pay the price he wanted to pay for it. The latter part of the answer is obviously indefinite. The witness later dispelled the uncertainty by the statement: 'I said willing to pay the price—he is willing to pay the price asked.' The answer indicated that the witness did not comprehend the true meaning of market value, and that, despite repeated efforts to qualify him to testify as to the market value of the land, he did not show

himself to be so qualified, and the court's indiscretion was not abused in refusing to permit him to give the sought-for opinion."

This case applies with great force to the situation before us. It reasserts the principle that market value is not the value in use or the value to the buyer. The City of Stockton v. Ellingwood, supra, and San Diego Land & Town Co. v. Neale, supra, are referred to. The reference to the latter shows that, despite the lapse of nearly fifty years, the case is still considered the law.

The last case is City of Redding v. Diestelhorst, 1936, 15 Cal.App.2d 184, 59 P.2d 177. Reading from page 193 of 15 Cal.App. 2d, page 181 of 59 P.2d:

"The definition of market value so often quoted in the later cases on eminent domain defines it as the highest price in terms of money that the land will bring if exposed for sale in the open market with a reasonable time allowed to find a purchaser buying with knowledge of all of the uses and purposes to which it is adapted and for which it is capable of being used. * *

"While it is true from the mere fact that no one is immediately ready, willing, and able to purchase a particular piece of property, it does not follow that the property has no market value, still, as was said in Joint Highway District No. 9 v. Ocean Shore Railroad Company [1933] 128 Cal. App. 743, 18 P.(2d) 413, 418: 'A market is essential to a market value.' In other words, a demand for the property is necessary, although that demand may be either active or potential."

Bandini Estate Co. v. Payne, 1935, 10 Cal.App.2d 623, 52 P.2d 959, was a tax case, which I tried while on the Superior Court of California. There, an attempt was made to set aside a valuation placed upon property because it exceeded recent depressed sales of comparable property in the vicinity. It was argued that the Board of Supervisors should have used these sales as the sole basis for valuation. The appraiser for the County had taken into consideration the sales, but had not considered them conclusive. On Mandamus, I held that a depressed sale is only one criterion, and that other criteria may be followed in determining what the market value of property is. What these cases teach is that when we take into consideration one criterion of value only, whether it be adaptability, actual use, or value in use and income from the property,

we are disregarding realities and determine the value of property by one factor only, which enters into its composition. And there is grave danger in such procedure.

To illustrate, I refer to another case which I tried while I was on the Superior Court of California, City of Los Angeles v. Allen, 1934, 1 Cal.2d 572, 36 P.2d 611. In that case, the question involved was whether we should substitute prospective use for actual use. When the City of Los Angeles widened Santa Monica Boulevard, the Harold Lloyd Company owned about forty acres, surrounded by improved subdivided property. This property was not subdivided. The City took twenty front feet. The property was assessed at $15,000 an acre as property suitable for subdivision purposes. As such the value of the portion taken was fixed at $8,614. But the owner said (in effect): "Well, right across the street you are paying them more. At that rate, I should receive $43,952.00." "Well," the answer was, "but they have subdivided. They are selling lots. You have merely acreage suitable for subdivision." The case went to the Supreme Court of California, and that Court upheld the ruling upon the ground that we must be governed by the actual condition of the property, by its adaptability. But adaptability cannot be given the effect of actuality, and subdivided lots be imagined on undivided acreage.

And taking one element of value as the guiding determinant works injustice.

Now, coming to the matter before us: All the witnesses on whose testimony the Commissioner relied, based their opinion of value *solely upon the income being derived from the property.* This was the whole import of the testimony of Mr. Holbrook, the only one of the debtor's witnesses who had any experience in the sale of lands. I go for a moment to the testimony of the others.

Mr. Watterson questioning Mr. Ceraldi:

"Q. By Mr. Watterson: Dr. Ceraldi, what, in your opinion, would that property sell for at a fair market value, in your opinion? A. Well, I still think this: That you would have to find a sucker to buy that vineyard and the value of the vineyard would be how big a sucker is that buys it. That is the way I answer it. I wouldn't bother with it myself. Any vineyard that produces two tons or less in this county— and I am speaking with authority about it—it is not worth anything. You cannot borrow one penny. You cannot even borrow money for the crop unless you can find some of the government agencies that will give you an emergency crop loan or something like that. That is my experience.

"Q. Well, would you say that the fair market value of that property is $50 an acre?

"The Witness: May I make a voluntary statement which might bring a little light on my answer, my previous answer?

"The Witness: All right, thank you very much, your Honor. Now, I am basing my answer on this fact: That I can buy— and this is a fact—land in a better district than which this vineyard is located today, for about $15 an acre. I am speaking of empty land. I can plant on that land some Mission grapes or some other grapes that will bear four or five tons to the acre on it. In about three years with an investment accrued in the purchase of the empty land of about $50 an acre, I will have a vineyard that will start to give me on the third year a couple of tons per acre, and the next year I will probably get four or five tons per acre, so how can I place even a $50 value on a vineyard that is in a God forgotten place over there that is subject to windstorms, to heat, to cold, to animals, it is rocky, when I have to cultivate I have to practically replace all my equipment in there. If I had to place a value on it, I would say it was worth $20 to $25 an acre, that is all. I feel that I am equipped to make this answer because I think practically every single vineyard in that district, in the Etiwanda district and the Fontana district—as a matter of fact, if you just go by Fontana, Foothill Boulevard, you will find vineyards that have gone to pieces that they will sell to you for practically nothing. It is the presence of the wind— not the wind, but the sandstorms. There is a difference between the wind and the sandstorms.

"Q. By Mr. Watterson: I take it from your answer that in your opinion the fair market value of that property does not exceed $25 an acre? A. Yes, and I still say if you find a sucker for it, you might get it.

"Q. By Mr. Gallagher: What is fair market value? A. What is a fair market value?

"Q. What does that term mean? A. In my opinion it means something if you are buying something that you can make

something out of it. In other words, something that you can produce or at least make a living or a certain profit in normal circumstances.

"Q. That is your conception of fair market value? A. Yes."

In other words, the man had no idea of the market value of the particular parcel. To refer again to Mr. Holbrook's testimony: While he is a real estate man, he did not take into consideration "value" at all. He based his opinion merely upon the yield of the vineyard. He did not take into consideration the assessed value. Then this question was asked of him, which shows that the entire testimony had no legal foundation:

"Q. Assuming a total gross income of $1,825.50 for the 1940 vineyard crop, and approximately $1,650 for the 1938 grape crop, and taking into consideration your observations as to the condition of the vines, the location, type of gravel or sand, what, in your opinion, is the reasonable market value of that property per acre? A. Well, I would say around $50 an acre.

"Q. $50 an acre? A. Yes.

"Q. And an over-all value of how much? A. Well, I would say $4500 would be a good value for that property."

While the words "market value" are used, the opinion is confined solely to value in use to the owner. This is not a legal criterion of value. In fact, from the face of the Commissioner's certificate, itself, it appears that the sole basis for his valuation was the productivity of the farm in the last few years.

The appraisal here is of utmost importance. It was a reappraisal requested, under statutory authority, by a secured creditor, after the debtor had already occupied the property for almost the full three-year period. This reappraisal fixed the value to be paid into court, less payments made on the principal, for distribution to all the secured and unsecured creditors, as their interests may appear. Thereupon it became the duty of the court, under the mandate of the statute, to "turn over full possession and title of said property, free and clear of encumbrances, to the debtor". Bankruptcy Act of 1938, § 75, sub. s(3), 11 U.S.C.A. § 203, sub. s(3). Every trial judge knows that whenever value is an issue in a proceeding, there is likely to be great disparity between the valuations of the appraisers. And this is true even when the appraisers on both sides are men trained in the art of valuation and conversant with the legal criteria upon which their judgment must be bottomed. But here we have a valuation which is less than a fourth of the value of the encumbrances which the debtor, himself, had placed upon this property—a valuation based purely on the poor years which the farmer has had, a wholly improper criterion of value.

Under the circumstances, where we have competent evidence of witnesses who were heard by the Commissioner, and whose integrity stands undisputed, rather than reverse the order, we should fix the true value, as disclosed by these witnesses, and modify the order.

The testimony presented by the creditor on the reappraisal was given by persons who had extended experience in appraisals. Mr. Grigsby, who has been engaged in appraising lands for about thirty years, gave his opinion, after taking into consideration all the elements to be considered—the location, the position with relation to adjoining property, the asking value, the sales, such as there were, opinions of others located in the vicinity—all the elements to be considered. He arrived at the conclusion that the property was worth $9,686.

Another witness was Mr. Evans, a man of excellent educational background, a graduate of the California Institute of Technology, specializing in chemical engineering, who has had much experience as an appraiser in this State, has been employed by various banks, the State Banking Department, the Commissioner of Corporations, has done appraisal work in San Bernardino and Riverside Counties, for the Metropolitan Water District, for the Orange County Flood Control District, for the United States Corps of Engineers, for the Veterans Welfare Board. With this background, he made an examination of the property, and, taking all the elements of value into consideration, in forming his opinion, placed the market value at $10,750.

Mr. Batchelor, a third witness, had been employed by the Commissioner to appraise this property originally. Mr. Batchelor is inheritance tax appraiser for the County in which the property is located. As such, he is charged with the duty of appraising estates of deceased persons, with the view of determining the estate taxes to be paid to the State. He examined the property and stated that, in his opinion, it was still

of the same value as before, $11,000. He was asked:

"Q. That is your opinion of the fair market value of that entire property at that time? A. It is.

"Q. $11,000? A. It is.

"Q. What valuation did you place on the property when you first appraised it for Commissioner Duffy? A. $11,000."

I do not think that the testimony of any of these witnesses was weakened on cross examination.

So, on the one hand, we have a valuation by persons who either did not have a correct understanding of what "market value" is, or, if they did, did not apply it, and who formed their opinion solely from present yield. Against this, we have three persons of wide experience in land value matters—one of them, the inheritance tax appraiser of the County—who arrive at an appraisal based upon a consideration of *all* the elements which should enter into it. Under the circumstances, the opinion of the latter should prevail.

The Court will, therefore, modify the order of the Commissioner entered by him on the 27th day of March, 1941, by changing the figure $4,400 to $9,696, and fix the value of the property at that amount.

Formal order to follow.