In re McNAY.

No. 5940.

District Court, S. D. California, N. D.

Feb. 16, 1945.

Grant H. Wren, of San Francisco, Cal., and Philip M. Wagy, of Bakersfield, Cal., for trustee.

Harvey, Johnston & Baker and C. W. Johnston, all of Bakersfield, Cal., for bankrupt.

YANKWICH, District Judge.

Orval Walter McNay filed his voluntary petition in bankruptcy on April 20, 1942. The petition showed that he had been engaged in the business of "roofing, insulation and interior tile contractor" in Bakersfield, Kern County, California, for seven years. His schedules showed liabilities totaling $18,004.94, and assets in the same amount, of which, however, $6,929.95 was property claimed as exempt. Among the assets he listed a stock of merchandise of the value of $4,000, and accounts receivable, as to which it was stated: "The estimated value of the amounts due is two thousand dollars."

As to his books and papers, the schedules stated:

"Books. All my books and business records are at 20 Kentucky Street, Bakersfield, California, in building locked up by the Sheriff of Kern County.

"Deeds. Deeds are in my possession, excepting those in building at 20 Kentucky Street, Bakersfield, California.

"Papers. Papers are at 20 Kentucky Street, Bakersfield, California, where my books are."

The items just reproduced were culled from the schedules because of their significance to the question involved here.

After due notice, under Section 58 of the Bankruptcy Act of 1938, 11 U.S.C.A. § 94, a hearing was had on October 7 and

8, 1942. No creditors appeared in opposition to the discharge. But the trustee filed objections to the discharge. The specifications were grounded on Subdivision c(2) and c(7) of Section 14 of the Bankruptcy Act of 1938, which read:

"c. * * * (2) * * * failed to keep or preserve books of account or records, from which his financial condition and business transactions might be ascertained, unless the court deems such acts or failure to have been justified under all the circumstances of the case; * * *." 11 U.S.C.A. § 32, sub. c(2).

"c. * * * (7) has failed to explain satisfactorily any losses of assets or deficiency of assets to meet his liabilities: * * *." 11 U.S.C.A. § 32, sub. c(7).

On May 15, 1944, the Referee made his findings negativing the charges of the trustee and discharged the bankrupt. The trustee has instituted a review of this order.

█ Our consideration of the petition is governed by certain principles which are not the subject of dispute between counsel for the trustee and the bankrupt. One of these is that the findings of a referee on conflicting evidence will not be disturbed. See Weisstein Bros. & Survol v. Laugharn, 9 Cir., 1936, 84 F.2d 419; and my opinion in Re Alberti, D.C.Cal., 1941, 41 F.Supp. 380. This is but an application to bankruptcy of the general rule that the findings of a trier of facts, be he commissioner, master, referee, or judge, will be sustained on appeal or review, unless they are clearly erroneous. See Federal Rules of Civil Procedure, rule 52, 28 U.S.C.A. following section 723c; In re Bendix, 7 Cir., 1942, 127 F.2d 759.

█ Our own Circuit Court of Appeals in applying this principle to discharges of bankruptcy, has declared repeatedly that the granting or denial of such discharge is in the sound discretion of the referee and will not be disturbed except for gross abuse. See Baash-Ross Tool Co. v. Stephens, 9 Cir., 1934, 73 F.2d 902; Hultman v. Tevis, 9 Cir., 1936, 82 F.2d 940; Rosenberg v. Bloom, 9 Cir., 1939, 99 F.2d 249.

This is also the rule in other circuits. See Texas National Bank of Beaumont v. Edson, 5 Cir., 1939, 100 F.2d 789; Baily v. Ballance, 4 Cir., 1941, 123 F.2d 352; In re Marx, 7 Cir., 1942, 125 F.2d 335; In re Bendix, 7 Cir., 1942, 127 F.2d 759.

We proceed to gauge the facts here by these principles.

The first specification charges a failure to keep books and records reflecting truly the bankrupt's financial condition. Bankruptcy Act of 1938, Sec. 14, sub. c(2), 11 U.S.C.A. § 32, sub. c(2). At the outset, it should be noted, as appears clearly from a reading of the stenographic transcript of the proceedings before the referee, that the accountant on whom the trustee relies for proof that the bankrupt did not keep adequate books and records, did not attach a *separate* meaning to the word "records". Throughout, he complained of inadequacy in the formal books of account. He complained, for instance, of the absence in the ledger, cash books and check records of entries after January 10, 1942. Then he added rather dogmatically: "The ledger was not complete, the cash book and the check records were not entirely complete; the entries had not been made there for cash entries after January 10; *It was then necessary in order to complete those records was to take these pink slips which are carbon copies of receipts, or receipts, then go for a verification to support these documents that they did actually represent receipts, go to the bank, trace them into the bank, and the same applied to the sales in order to complete the accounts and show that the accounts were supported and the records in order to complete the records for my own work, necessary to follow it through other information unobtainable from the ledger or the cash book or both, so that in order that I would be absolutely correct as far as cash entries were concerned, I had to go to other places for that record than the cash book and the ledgers.*" [Emphasis added.]

█ Counsel for the trustee evidently labors under the same misapprehension. Nowhere in his brief written in support of the petition for review does he attribute to the word "records" a meaning other than "books". These words have been in the bankruptcy statute for so many years that courts have had ample opportunity to rule that *records* may be written data other than *formal accounting books,* such as memoranda of sales, receipts, checks, bank deposits and the like. The cases which point out this distinction go further and hold that in determining what books and records are, there is no requirement of conformity to a perfectionism so dear to public accountants, that each case must be judged separately and that businesses

which do not require complex records may satisfy the requirement by the crudest forms of books and records. See International Shoe Co. v. Lewine, 5 Cir., 1934, 68 F.2d 517; Anderson v. Haddonfield National Bank, 3 Cir., 1938, 94 F.2d 721; In re Marx, 7 Cir., 1942, 125 F.2d 335; Klein v. Morris Plan Industrial Bank of New York, 2 Cir., 1942, 132 F.2d 809, 144 A.L.R. 1278; In re Bendix, 7 Cir., 1942, 127 F.2d 759. As said in Hedges v. Bushnell, 10 Cir., 1939, 106 F.2d 979, 982: "Here the bankrupt kept and preserved some records. True, they consisted of *bank accounts, invoices of gasoline purchased from the refinery, sales slips, cancelled checks and check stubs. But the statute does not exact or concern itself with any particular form of books or records. An impeccable system of bookkeeping which would meet with the approval of a skilled accountant or records so complete that they would satisfy an expert in business is not required as a prerequisite to discharge.* Karger v. Sandler, supra [2 Cir., 62 F.2d 80]; In re Underhill, supra [2 Cir., 82 F.2d 258]. Records need not be so complete that they state in detail all or substantially all of the transactions taking place in the course of the business. It is enough if they sufficiently identify the transactions that intelligent inquiry can be made respecting them." [Emphasis added.]

The bankrupt was in the *roofing and tile contracting business in Bakersfield for seven years,* six years at one location, and the last year at the location given in his petition. The charge of failure to keep books does not extend to the entire business career of the bankrupt, or even a substantial portion of it. It covers a short period *between December 31, 1941, and January 23, 1942.* As of December 31, 1941, the bankrupt had not only books showing accurate entries, but the very accountant who, *in court,* testified against him, had prepared a complete financial statement from those books and records. The actual deficiency is alleged to date from January 10, 1942, and to terminate on what, for the bankrupt, was a fatal day, when a levy under attachment was made on his business by the Sheriff of Kern County. The Sheriff took possession of the stock in trade, the books and everything that was in the bankrupt's place of business. Thereafter the defendant collected some moneys, with which he paid the labor to complete certain outstanding contracts. The record of such payment is contained in the only book which was not in the store when the attachment was levied,—the pay roll book. The bankrupt's bank account was attached. Whereupon the bank exercised its lien and applied the whole of the bank account, amounting to $2,522.50, to the bankrupt's indebtedness. To secure money to cover outstanding checks, the bankrupt assigned to the bank certain accounts receivable, in the sum of $5221.85. These accounts were duly entered on the books. On the basis of the assignment, the bank loaned him a thousand dollars which he used to complete certain jobs after the attachment. This loan and the accounts assigned were properly listed by the bankrupt in his schedules as secured claims.

The trustee complains that the assignment was not entered on any book, and that no record was made on the books of some accounts collected. The fact, however, is that the bank's record showed the assignment and the bank checks which they honored showed the expenditures made. As the bankrupt's place of business had been attached, these bank checks which, ordinarily, would be picked up periodically by him or by his bookkeeper, remained with the bank.⁸ After adjudication, the assignment, the collections, the expenditures were all truthfully reported by the bankrupt. The trustee seems to think that if an expert accountant has to go to a bank in order to find the full details of a small transaction, that that, in itself, is a failure to keep books and records for which a discharge should be denied. We do not so understand the law. As said by the Fifth Circuit in International Shoe Co. v. Lewine, 1934, 68 F.2d 517, 518:

"The lack now most insistently urged is that there was no record of the bankrupt's real estate, of the furniture and fixtures, nor of his indebtedness to the bank. It is testified, however, *that the furniture and fixtures appeared in the annual inventories. The real estate holdings would appear from the bankrupt's deeds, and bank debts could be ascertained by a natural and simple inquiry at the bank.* The real estate, indeed, was mainly the leases on the stores. Every creditor knew or could learn about the stores and the fixtures in them with which business was being daily done. Omission to record these matters by a bookkeeper with no bad motive suspected

ought not to deprive an honest bankrupt of his discharge. Part of the records kept, notably the last inventory and some of the check stubs and canceled checks, were burned in the fire and in this sense not kept. Such an accidental loss of records is not the destruction or mutilation of them meant by the statute, nor is it the failure to keep them which is intended to be penalized." [Emphasis added.]

To interpret the law otherwise would result in grave injustice. We should not set up for a man managing a small business with the help of an office girl, a standard which would satisfy a supercilious public accountant. And, wisely, the cases interpreting the requirement under discussion, have said so repeatedly. [See cases above.]

■■ In the last analysis, in this case, when bankruptcy occurred, from the books on file, from the sales slips, from the checks, bank deposits and the data which the bankrupt had at his home, and the information secured from the bank, his financial condition and business transactions could be and actually were ascertained. That the records following the attachment were not complete is not material. After all, the law recognizes emergencies. We take judicial notice of the disorganization which follows when a man conducting a contracting business finds his business place under attachment, his bank account attached, and his books out of his possession. It is not reasonable to expect him under the circumstances, to sit down and set up a new set of books or records, especially when all he attempted to do is to keep his good faith with general contractors or owners and complete certain work-in-progress.

■ There remains the period between January 10th and January 23d, as to which the accountant testified that the bookkeeper did not make any entries. As to this, we have a conflict between the testimony of the accountant and the testimony of the bankrupt, supported by the testimony of the bookkeeper, whose conversation with the bankrupt at the time of the hearing, the bankrupt was allowed to repeat. All agree that as of January 10th, a new system of bookkeeping was to be established. The accountant states that the system was all set up and that he instructed the young lady bookkeeper as to the methods of entry. Her testimony, as related by the bankrupt, is to the effect that she did not receive adequate instructions, and, therefore, for a few days, neglected to make proper entries in the books. But the sales slips, the bank deposits, the checks issued during that 13-day period were records from which these transactions could be, and actually were, reconstructed. So that, assuming that there was a failure to enter these transactions in the books, and that the records might not be complete, the referee was justified in taking the explanation of the bankrupt and his bookkeeper that she had no books during the period in which to make the entries. For, ultimately, the failure to keep books and records is not, in itself, a ground for denying discharge. Even present such failure, the Bankruptcy Act nevertheless allows the referee, in the exercise of his sound discretion, to grant discharge if he deems such "failure to have been justified. under all the circumstances of the case." And, certainly here, there is ample justification for any deficiency in keeping the formal books.

■ It should be added that the failure to keep or preserve books of account or records which the bankruptcy court may penalize, must continue during the bankrupt's entire business career, or for a substantial portion of it. When incompleteness of books extends only to a period of thirteen days, it is inconceivable that such period should be separated from the remainder of the business career of the bankrupt extending over years in the same city. Ultimately, the Court must determine whether, during his entire career, the bankrupt kept adequate books and records. Of course, it is conceivable that a bankrupt might deliberately, *immediately before bankruptcy*, enter into many transactions which he cannot account for honestly and that such action might make it impossible to account for a sudden shrinkage of assets, and call for a denial of discharge. We know cases of fraudulent and absconding debtors who, in the last few days before,—in army language,—"going over the hill", drew out large amounts of money or disposed of valuable stocks of merchandise without a record. But we have no such situation here. The transactions carried on during the short interim between the 10th and 23d were small. Assuming that these transactions should have been entered in the books of original entry, the obvious and legitimate excuse is that they

were out of the possession of the bankrupt. And he made an honest and true accounting from such records as he kept, of every item which came into his possession. No more should be required of him.

■ The trustee complains about certain Hanford accounts. The testimony of the bankrupt showed that on October 10, 1941, $1500 was transferred from the bankrupt's Hanford account to his Bakersfield account. The books contained proper entries as to this transfer as well as other entries sufficient to cover the moneys collected from the Hanford jobs.

The accountant testified that when he made the audit of December 31, 1941, he found records concerning these items.

It thus appears that not only were these bills marked paid on the books,—*in itself a sufficient entry to satisfy the requirement for books and records,*—but also that the moneys were duly accounted for by the bankrupt in his books and on his examination.

One other matter should be adverted to.

■ The new set of books which the accountant set up as of the 10th of January seems to have disappeared. The bankrupt did not take them out of his place of business. He states that they and all other books, excepting the pay roll, were at his place of business when the levy was made. In sum, I believe that the referee was right in holding that the trustee has not sustained his charge that the bankrupt had failed to keep or preserve books of account or records. For the record before me shows a large and complete bookkeeping system, containing, in two massive looseleaf binders, all the ordinary books which the ordinary business man would be required to keep. In addition, there are bank checks, bank deposit slips, duplicate invoices of deliveries, merchandise sales slips, lists of accounts payable and accounts receivable, both properly recorded in the books, from which such entries as may have been omitted from the books during the short interval of time here under consideration, could be ascertained and the true financial condition of the bankrupt established. Any deficiency in these records was easily justified by the misfortune which befell him when one of his chief creditors sued him and closed his business. Incidentally, to this chief creditor, the Parafine Company, is also traceable one

of the chief grounds for the second of the trustee's specifications in opposition to discharge,—namely, that the bankrupt had failed to explain satisfactorily any loss of assets or deficiency of assets to meet his liabilities. Bankruptcy Act of 1938, Sec. 14, sub. c(7), 11 U.S.C.A. § 32, sub. c(7).

■ Two of the items urged in support of this specification are what might be called "bookkeeping items". They are not discrepancies *in fact,* but discrepancies alleged to come into being by reason of valuations given to certain stock in trade and accounts receivable in his petition and corresponding valuations appearing in the books and records of the bankrupt. The first of these, which is traceable to the Parafine Company, is the inventory of merchandise of December 31, 1941. The testimony shows that this company sent one of its employes late in December to the bankrupt. One day, between the hours of 10 in the morning and 4 in the afternoon, *taking the usual time off for lunch,* this employe made a cursory survey of the merchandise. The company's employes set the inventory price as to all items, the bankrupt setting the price of tile only. The all-over value given was $6,444.28. *No inventory in the true sense of the word was taken.* The separate pieces were not counted. The quantities of merchandise were merely estimated. And work which should have taken several days was done in a few hours. When the levy under the attachment was made, the books, including this inventory, were in the possession and under the control of the sheriff. When the bankrupt came to give the value of the stock in trade, as of April 20, 1942, he listed it as follows:

"Stock of merchandise, office fixtures, tile, roofing and insulation material at 20 Kentucky Street. Same was attached in Margaret Brolliar vs. Orval McNay, Case No. 37372, Superior Court, but no one has been in possession after the first month, although the Sheriff has had it locked up ............................ $4000.00"

As the stock in trade was not under the bankrupt's control, he merely made an estimate of what its value was on that date, allowing for withdrawals made between December 31, 1941, and January 23, 1942. *The trustee has not shown that any of the stock in trade disappeared.* The testimony in the record warrants the conclusion that a count inventory would show that all the

stock that was there on December 31, 1941, less such as may have been withdrawn through sales in the ensuing twenty three day period, was actually turned over to the sheriff when the levy was made and was received by the trustee when he was appointed. To blame a shrinkage on the bankrupt merely because he placed an arbitrary value on the stock on December 31, 1941, on the inept stock-taking by the representative of one of his chief creditors, and later, when deprived of his books, including this so-called inventory, he could, at most, guess at a value when filing his schedules in bankruptcy, is to substitute speculation for reality. Shrinkage of assets, which is the badge of fraudulent bankruptcy, is not of this character. See Stewart v. Ganey, 5 Cir., 1940, 116 F.2d 1010. It is the sudden disappearance of moneys or merchandise of the type with which we are confronted occasionally when trustees seek to recover assets fraudulently conveyed. See Stewart v. Ganey, 5 Cir., 1940, 116 F.2d 1010; In re Bendix, 7 Cir., 1942, 127 F.2d 759; Duggins v. Heffron, 9 Cir., 1942, 128 F.2d 546. No such conditions exist here as to either of the items under discussion.

As to the accounts receivable, it is to be remembered that the bankrupt did not have them before him, when he filed his schedules. So he listed them in his inventory in this manner: "Debts due petitioner on open account by various persons. The books and records of the names of the debtors and the amounts due are in the place of business at 20 Kentucky Street, Bakersfield, California, and have been locked up by the Sheriff of Kern County. *The estimated value of the amounts due is $2000.00.* (This amount includes the debt due by Trewhitt-Shields & Fisher which is about $800.00. In addition, Attorney James Petrini has a check for $500.00 from Trewhitt-Shields & Fisher payable to petitioner which he has refused to turn over to Bankrupt. The amount does not include open accounts which were assigned to Bank of America National Trust & Savings Association, East Bakersfield Branch, for security on money borrowed." (Emphasis added.)

It will be seen that he deducted the accounts assigned to the bank. This very mention of the assignment is proof positive that he had no intention of concealing any fact or record which bore upon his financial condition. Without the books, and without the accounts themselves, the best he could do is to estimate their value. So he wrote that "the estimated value of the amounts due is $2000.00." As in the case of the stock in trade, the trustee, here, *without showing an actual shrinkage in the assets,* would hold him to an accounting for the difference between the accounts receivable as they are set up on the books and the estimated value which he gave in the schedules. The evidence in the record shows unequivocally that the accounts receivable, including the money in the bank on January 31, 1942, and the $1,000 borrowed on January 24th, totaled $5,842. The records introduced at the time of the trial, including the money actually in the bank at the time of the attachment, the moneys paid out after the attachment was levied, and entered on the pay roll and additional checks show a total expenditure of $6,246.72. The bankrupt collected $151.61 on one account known as the LaHore account, $100 for his equity in his car, and $130 from another customer, Martini. When these amounts are added to the total expenditures, it is apparent that the bankrupt actually accounted for more money than he received from all sources from January 1, 1942, until he completed the work on the outstanding jobs in February. Here, again, there is no shortage, but an attempt to hold the bankrupt to an estimate and charge him with the difference between it and a previous estimate, as if it amounted to an actual shrinkage.

Two other matters charged under this specification were urged earnestly before the referee and before this court.

It is claimed that the bankrupt has not accounted for merchandise delivered to one Guy Hall on January 23, 1942. What happened was this: The material was ordered before the attachment. It was picked up by the bankrupt's truck driver, who, as was the custom, was to leave the receipted invoice, after delivery, at the bankrupt's place of business. The truck driver picked up the merchandise on January 23, 1942, before the sheriff reached the bankrupt's place of business. When he returned with his truck to the bankrupt's place of business, the sheriff took possession of it. Whether the truck driver tore up the receipted sales slip, or whether he gave it to the sheriff, no one knows. But the fact is that the bankrupt gave to the

trustee information about the sale. Hall has admitted receiving the merchandise. And the only explanation that the trustee gave in open court for not seeking to recover from Hall is that Hall has a counterclaim for money allegedly due him from the bankrupt. So, here again, a satisfactory explanation has been given. But the trustee has yet another grievance under this specification.

He claims that among the equipment which the bankrupt was supposed to have in his possession was a spray gun. The spray gun was obsolete,—fifteen years old. The bankrupt testified, without contradiction, that it was not worth more than fifteen or twenty dollars, that he could not use it, and it had, therefore, no value to him in his work. A workman, living in his neighborhood, asked him once if he couldn't take it, repair it, and use it in whitewashing barns on farms. It disappeared. And the bankrupt assumes that this man picked it up from the bankrupt's house where he kept it. Should the bankrupt be denied discharge because he improvidently let a workman have a piece of equipment? We all know that people having tools lose them, at all times, through the borrowings of persons who forget to return them. When the Bankruptcy Act made unexplained shrinkage in assets a cause for denial of discharge, it did not have in mind petty losses of this type. It had in mind those sudden depletions in the assets of a bankrupt immediately prior to bankruptcy which indicate a desire on his part to use the Bankruptcy Act to cover dishonest manipulations aiming to enrich him at the expense of his creditors.

None of the creditors filed any objections to the discharge. The trustee, no doubt, was sincere in his belief, induced, as the record seems to indicate, by the views of the accountant as to what constitute books or records, that a discharge should be denied.

But I am convinced, after a thorough study of the entire record, that not only was the referee right in granting the bankrupt his discharge, but that to have denied it to him would amount to an injustice to a person who, being unfortunately forced into bankruptcy by a creditor, endeavored, to the best of his ability, to fulfill the obligations imposed upon him by the Bankruptcy Act.

The order of the Referee, dated May 15, 1943, is, therefore, affirmed.